THOMASSON (UNITED STATES v.). See Cases Nos. 16,478 and 16,479.

THOMAS SPARKS, The (NELSON v.). See Case No. 10,115.

### Case No. 13,931.
#### The THOMAS SWAN.
[6 Ben. 42.] [1]

District Court, S. D. New York. April. 1872.

SHIPPING — STEAMBOAT ACT — INTER-STATE COMMERCE—PENALTY—SECURITY OF PASSENGERS.

1. A steamboat, engaged in carrying freight between New Jersey and New London, Con-

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

necticut, while at New London, received on board a number of persons and carried them to Mystic Island in the state of Connecticut, for the purpose of a prize fight, and then carried them to Noank, in Connecticut. She was not provided with life preservers, &c., as was required by the 5th section of the act of August 30th, 1852 (10 Stat. 61), nor had her boiler been inspected, as required by the 9th section of that act. A libel was filed against her, to recover a penalty of $500 therefor: *Held*, that the power of congress to regulate commerce among the several states extends to the waters traversed by the steamboat, but that it is requisite that the vessel which is to be subject to such regulations as those alleged to have been violated, should be engaged in inter-state or foreign commerce.

2. This steamboat was not shown to have been so engaged, within the principles laid down in the case of The Daniel Ball (10 Wall. [77 U. S.] 557).

[Cited in Re Long Island, etc., Transp. Co., 5 Fed. 604.]

In admiralty.

Thomas Simons, Asst. Dist. Atty., for the United States.

Beebe, Donohue & Cooke, for claimant.

BLATCHFORD, District Judge. This suit is brought by the United States against the steam propellor Thomas Swan, to recover the sum of $500, as a penalty. The libel of information alleges, that, on the 2d of March, 1870, the Thomas Swan, being a vessel propelled in whole or in part by steam, was navigated, with passengers on board, at and from the port of New London, in the state of Connecticut, without complying with the terms of the act of August 30th, 1852 (10 Stat. 61), in this, that she was then and there navigated, with passengers on board, not being provided with life preservers, and floats, and fire buckets, and axes, as required by the 5th section of said act, and also in this, that she was then and there navigated with passengers on board, without having been inspected, as required by the first subdivision of the 9th section of said act, contrary to the first section of said act; and that thereby the said vessel became subject to a penalty of five hundred dollars, and to be seized and proceeded against summarily, by way of libel, therefor, in this court  The libel prays for a decree for the said penalty against the vessel, and for her condemnation and sale to satisfy the amount of the penalty.

The answer excepts to the libel, and alleges the following grounds of exception: (1) The libel does not show a cause of action against the vessel; (2) it is not set forth in the libel, that the alleged carrying of passengers was any except between ports in the same state and in the internal commerce thereof; (3) the libel does not set forth any cause of action, or carrying of passengers, on waters, or in a business, over which the United States had or has jurisdiction. As matter of fact, the answer avers, that, on the day stated in the libel, the vessel was, against the will of her master and owner, taken possession of by a mob, and used by such mob to carry them from New London, in the state of Connecticut, to Mystic Island, in the same state; that such transportation was against the wish and desire of the master, owner and authorized agent of the vessel, and against their rights; and that, for such acts of violence, neither the vessel nor her owner, who is the claimant, is responsible. The answer also states, as a ground of exception to the libel, that the libel does not allege that any suit or prosecution has ever been commenced or attempted, or any penalties found, against any person or persons who committed any of the acts alleged in the libel, and that, therefore, no lien exists against the vessel.

The libel alleges a seizure of the vessel, before suit brought, on waters navigable from the sea by vessels of ten or more tons burden, and within this district.

The 5th section of the act of August 30th, 1852, provides, hat "every such vessel, carrying passengers," that is, as defined in the 1st and 3d sections of the act, every "vessel propelled in whole or in part by steam," and carrying passengers, shall be provided with a certain number of life preservers or floats, and fire buckets and axes, as specified in the 5th section. The 1st subdivision of the 9th section of the same act provides for the inspection once in every year, at least, by certain inspectors, of every steamer employed in the carriage of passengers. The 1st section of the same act provides, that if any vessel propelled in whole or in part by steam, shall be navigated, with passengers on board, without complying with the terms of that act, the owners thereof and the vessel itself shall be subject to the penalties contained in the 2d section of the act of July 7th, 1838 (5 Stat. 304). The penalties contained in that section are the forfeiture and payment to the United States of the sum of five hundred dollars, for which sum the vessel "shall be liable, and may be seized and proceeded against summarily, by way of libel, in any district court of the United States having jurisdiction of the offence."

The answer raises the question whether congress has any power, by legislation, to regulate the carrying of passengers by a vessel under such circumstances as existed in this case. The Thomas Swan was employed, at the time in question, in the regular business of carrying coal, from Hoboken in New Jersey, to New London and Norwich in Connecticut, and in taking back to Hoboken such cargo as she could procure. She had no accommodations for passengers, no cabin for them, and was not in the business of carrying them. She had been to Norwich and discharged there some iron which she had taken from Hoboken. From Norwich she went to New London, and there discharged all the rest of her cargo, being coal. Her boiler was injured on her trip from Norwich to New London, and it was repaired while she lay at New London. On the occasion in

question she carried a large number of persons from New London, to an island called Mystic Island, below the mouth of the harbor of New London, and near the Connecticut shore, on which island such persons landed, the vessel remaining at a wharf at the island. The persons so carried were some of them actors in, and others of them spectators at, a pugilistic combat which took place on the island. Afterwards such persons reembarked on the vessel, and were taken by her to and landed at a place called Noank, on the main land of Connecticut. From there the vessel proceeded, without any passengers, to the city of New York, touching on the way at a wharf in the harbor of New London. The trip with the persons referred to, other than the proper crew of the vessel, was wholly within waters in the state of Connecticut.

The power invoked under which it is claimed that the legislation of congress can be held to apply to this vessel, while engaged in the transaction in question, is that conferred on congress by the eighth section of the first article of the constitution, "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." There is no doubt, since the decision in the case of Gibbons v. Ogden (9 Wheat. [22 U. S.] 1), that the power to regulate commerce among the several states, comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States, which are accessible from a state other than that in which they lie; and that such power, so far as locality is concerned, extends to the waters traversed by the Thomas Swan while carrying the persons referred to, on the occasion in question. Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713, 724; The Daniel Ball, 10 Wall. [77 U. S.] 557, 564. But, while the conferring of that power authorizes all appropriate legislation to insure the convenient and safe navigation of all the navigable waters of the United States, including the subjection of vessels to inspection and license, in order to secure their proper construction and equipment, yet the legislation is only authorized when it protects or advances inter-state or foreign commerce; and this requires, at least in respect to regulations like those alleged to have been violated in this case, that the vessel, to be subject to such legislation, shall be engaged in inter-state or foreign commerce. The Daniel Ball, supra; The Bright Star [Case No. 1,880].

Was the Thomas Swan engaged in inter-state or foreign commerce, in respect to the carrying of passengers, on the occasion referred to? In the case of The Daniel Ball supra, a penalty was sought to be recovered against the vessel by the United States, because she had not been either licensed or inspected, as provided by the said acts of 1838 and 1852. It was set up, as a defence, that the vessel was engaged solely in domestic trade and commerce within the state of Michigan, and was not engaged in trade or commerce between two or more states, or in any trade by reason of which she was subject to the navigation laws of the United States, or was required to be inspected and licensed. The license was required for a vessel transporting merchandise or passengers; the inspection, for a vessel carrying passengers. The Daniel Ball was employed in transporting merchandise and passengers on a route wholly in the state of Michigan. Some of the goods she carried were shipped on her for places in other states than Michigan, and some came from other states, and were destined for places within the state of Michigan. She was a common carrier on the route on which she ran, although she did not run in connection with or in continuation of any lines of transportation beyond her route. The supreme court held, that, so far as the vessel was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan, and destined to places within that state, she was engaged in commerce between the states, and was subject to the legislation of congress. The ground of the decision was, that the vessel was employed as an instrument of commerce between the states—commerce between the states, in any commodity, commencing whenever such commodity has begun to move, as an article of trade, from one state to another—and that the fact that several different and independent agencies were employed in transporting the commodity, some acting entirely in one state, and some acting in two or more states, did not affect the character of the transaction, but each agency was subject to the regulation of congress to the extent in which it acted in such transportation.

I do not think the Thomas Swan is, on the evidence, brought within these principles. It is not shown that she transported any passenger whose destination was, in any proper sense, from any place without the state of Connecticut to Mystic Island, or from Mystic Island to any place without the state of Connecticut. She was not, in any proper sense, an instrument in carrying passengers from without the state of Connecticut to Mystic Island, or from Mystic Island to any place without the state of Connecticut. Nor is there any evidence that any passenger she carried was transported, in any proper sense, by her agency, from without the state of Connecticut to Mystic Island, or from Mystic Island to any place without the state of Connecticut. No circumstance like the buying of a ticket for transportation, though by different agencies, from any place without the state of Connecticut to Mystic Island, or from Mystic Island to any place without the state of Connecticut, on the part of any passenger carried by the Thomas Swan is shown. Nor is it shown that any person she took to Mystic Island had any destination to Mystic Island at any time while such person was

outside of the limits of Connecticut. The only tickets shown to have been sold connected with any transportation to Mystic Island, were tickets sold at New London, which entitled the buyers to transportation to Mystic Island and back to a point in Connecticut. The fact that the persons who returned from Mystic Island to the main land in the vessel, intended to go to places outside of Connecticut, cannot affect the question.

The libel must be dismissed.