*In re* PETITION OF THE LONG ISLAND NORTH SHORE
PASSENGER & FREIGHT TRANSPORTATION
COMPANY.

*(District Court, S. D. New York.* February 12, 1881.)

1. LIMITED LIABILITY ACT—REV. ST. § 4282 *et seq.*—VESSELS NAVIGATING EAST RIVER AND LONG ISLAND SOUND—ADMIRALTY JURISDICTION—MARITIME LAW.

The act limiting the liability of ship-owners, (St. 1851, c. 43; Rev. St. § 4282 *et seq.*,) so far as it limits the liability for damages caused by the negligence of the master and crew, without the knowledge or privity of the owners, to the value of the ship and freight, upon a surrender of the same, applies to vessels navigating the waters of the East river and Long Island sound between ports of the state of New York, and not engaged in foreign or interstate commerce.

This limitation of liability is a rule of the general maritime law, and since the passage of the act of congress it has been a part of the maritime law of the United States, or rule of the sea, to be administered by the admiralty courts of the United States in all cases of vessels navigating the waters of the United States other than those excepted by the statute, viz., " any canal-boat, barge, or lighter, or any

vessel of any description whatsoever used in rivers or inland navigation."

Vessels navigating the East river and Long Island sound are not within the exception.

This statute, though as respects vessels engaged in foreign and interstate commerce it can be justified under the power of congress to regulate commerce with foreign nations and among the states, is not to be construed as limited in its operation to such vessels, but applies also to vessels engaged exclusively in the commerce of a single state, navigating the navigable waters not excepted, and so applied it is not unconstitutional. It is a valid exercise of the powers of legislation given to congress in those clauses of the constitution which provide that "the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction," and that congress "shall have power to make all laws which shall be necessary and proper for carrying into execution  *  *  *  all powers vested by this constitution in the government of the United States, or in any department or any officer thereof."

Congress has power to make the admiralty and maritime jurisdiction of the courts of the United States exclusive of all state jurisdiction, and may, in the exercise of its power to erect courts inferior to the supreme court, and to prescribe their powers and jurisdiction, give or withhold particular remedies in a particular class of admiralty and maritime causes. It may by law provide that all claims of a maritime character, growing out of a single disaster, be presented and tried in one proceeding, and may restrict the remedy in such cases to a proceeding *in rem* against the vessel and freight, withholding all remedy *in personam*, or limiting the latter to the value of the vessel and freight; and such is the effect of this statute.

The maritime law of the United States consists of those rules and principles of the general maritime law which have been adopted and acted on in the United States. It is of uniform operation throughout the country, and superseded the maritime law in force in the several states at the adoption of the constitution. It is subject to change by the adoption of rules of the general maritime law of the world not before adopted as part of the maritime law of the United States.

The courts can only declare what the maritime law of the United States is.

Whether, independently of its power to regulate commerce, congress has a general power under the constitution to change the maritime law of the United States by adopting, as part of that law, a rule or principle of the general maritime law not before adopted, *quære*.

Even if congress has not this power, by direct legislation, to enact this statute otherwise than as a regulation of commerce, the adoption of this rule of limitation of liability, so far as the power of congress extends as to all sea-going vessels engaged in interstate and foreign commerce upon the exterior waters of the United States, is a controlling circumstance showing that this general rule of maritime law

has been adopted by the United States, and therefore since the passage of the act this rule of limited liability, though not before adopted, has been part of the maritime law of the United States.

Claims for personal injury caused by fire and explosion on board a steam-boat prosecuting her voyage on the East river, are claims, the liability for which is limited by the statute.

Claims for damages given by a state statute to the administrators or relatives of a person killed by such fire or explosion, are cases of marine tort, cognizable in the courts of admiralty, and are among the claims the liability for which is limited by the statute.

If a petition by a ship-owner, under the statute, does not state a case within the admiralty and maritime jurisdiction of the United States, and nevertheless a monition issues, and on the return of the monition the petioner amends his petition by adding allegations bringing the case within the jurisdiction, *it seems* that the court should not proceed to a decree, to be operative upon parties who have not appeared, without issuing an *alias* monition upon the amended petition.

Whether a transfer of the ship and freight made to a trustee under the order of the court, where the *res* was sold by the trustee prior to such amendment of the petition, would avail the petitioner as a surrender under the statute, *quære.*

Statute 1871, *c.* 100, § 43, (Rev. St. 4493,) which provides that the owner shall be liable for injuries to the person and baggage for full damages in case the explosion, fire, etc., happens through any neglect or failure to comply with the provisions of law for the regulation of steam-vessels, or through known defects of the steaming apparatus or of the hull, does not take claims for personal injury or loss of baggage out of the limited liability statute. Rev. St. 4282 *et seq.* It merely imposes a further condition, of the limitation of liability in those classes of cases, that the injury did not happen by reason of any of the causes mentioned in section 4493.

The provision of Rev. St., § 4285, that " after such transfer of the ship and freight all claims and proceedings against the owner shall cease," makes the jurisdiction of the district court after such transfer, and pending the proceeding, absolutely exclusive, and gives power to the district court to restrain by order the prosecution of any suit growing out of the disaster theretofore commenced and then pending in a state court. The exercise of this power is not probited by Rev. St. § 720, which provides that " the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state, except in cases where such injunction may be authorized by any law relating to any proceedings in bankruptcy.

*W. D. Shipman* and *J. Larocque,* for petitioners.

*F. R. Coudert, Leo. C. Dessar, Albert Cardozo, Bush & Clark, H. B. Kinghorn, Geo. Wilcox,* and *W. De F. Edwards,* for sundry claimants.

CHOATE, D. J. This is a petition filed by the owner of the steam-boat Seawahnaka for the benefit of the acts of Congress for limiting the liability of owners of vessels.

The original petition alleged that the petitioner is a New York corporation owning and running a line of steam-vessels for the carriage of freight and passengers between the city of New York and Roslyn, and intermediate points and places all in the state of New York, and that its vessel the Seawahnaka was one of said line, and was duly enrolled at the office of the collector of New York; that on the twenty-eighth day of June, 1880, while said vessel was on her regular trip from New York to Roslyn with a large number of passengers, and a large and valuable cargo belonging to several persons, and when near Hell Gate, she was found to be on fire, and it became necessary to beach her, which was done on Randall's island, where she burnt to the water's edge and became an utter wreck; that the cargo and other property on board were thereby lost and destroyed, and many of the passengers were killed or drowned or seriously injured, and that no freight had been received on said cargo; that the fire happened, and the loss and damage was done and incurred, without the design, neglect, or fault of the petitioner, and without its privity or knowledge; that certain claims have been made and certain suits have been commenced against the petitioner by persons claiming to have sustained damage as owners, shippers, or consignors of cargo, or as passengers, or representatives or relatives of passengers killed by said disaster, and that said claims far exceed the value of said wreck.

The prayer of the petition is for the appointment of a trustee to receive a transfer of the said wreck, for a monition to all parties having claims to come in and make proof thereof and answer, for a decree determining the liability of the petitioner and limiting its liability, if found liable at all, to the value of said wreck, for the distribution of its proceeds among the claimants if entitled thereto, and for an order restraining all suits pending the final determination of this proceeding.

Upon filing the petition a trustee was appointed, to whom

the wreck was transferred, a monition as prayed for was issued, and an order was made restraining the prosecution of suits pending this proceeding.

Upon the return-day of the monition serveral parties appeared, who filed exceptions to the petition, or moved to dismiss the petition for want of jurisdiction in the court, or to set aside the monition and vacate the restraining order on various grounds, some of which are of general application to all the claims and some are applicable to particular claims. One of the points made against the jurisdiction of the court was that the petition showed that the vessel was engaged only in commerce between ports of the state of New York.   The petitioner, upon the hearing of the motions and exceptions, asked leave to amend the petition, and aver that although the service of said steam-boat was between ports all in the state of New York, yet it formed a link in the chain of commercial intercourse between this state and other states and foreign countries, and that said vessel was engaged in the transportation over the waters of Long Island sound of merchandise coming from foreign countries and from other states, and destined to points in this state on the route of said steamboat, and in the transportation over said waters of goods shipped within this state, destined for and addressed to ports and places in other states of the United States and foreign countries, and also in the transportation of passengers destined to and coming from other states.

Some of the claimants who have appeared have answered the amended petition, and, upon the hearing, the right of all parties appearing to answer was reserved till a day to be fixed after the decision of the court upon the motions and exceptions.   So far as the question of jurisdiction rests upon the point that the vessel was, upon the averments of the petition, engaged exclusively in the commerce of the state of New York, and therefore that the limited liability act, considered as a regulation of commerce, has no application to the case, on the conceded principle that the power of congress to legislate for the regulation of commerce is limited to the passage of laws for the regulation of commerce between the states and

with foreign countries and the Indian tribes, the defect is clearly cured by the amendment, and the amended petition states a case of interstate commerce such as has been authoritatively held to be within the power of commercial regulation of the United States. *The Daniel Ball,* 10 Wall. 565; *The Thomas Swan,* 6 Ben. 42; *The Sunswich,* Id. 112. The case of *The Bright Star,* 1 Woolw. 266, is not inconsistent with this conclusion, upon the very distinct and positive averments of the amended petition in respect to the business in which this steam-boat was engaged. This amendment, however, does not relieve the court from the necessity of determining the question as to the jurisdiction of the court upon the case made by the original petition, since, if that petition did not state a case within the admiralty and maritime jurisdiction of the court, it would be proper, if not necessary, in view of the decree which the court may make, being operative upon parties who have not appeared, that an *alias* monition should be issued upon the amended petition; and it is, perhaps, questionable whether the transfer of the wreck already made, which was sold before the amendment of the petition, would be available to the petitioners in this proceeding, if the court had not then jurisdiction of the case made by the petition. The question, therefore, whether the original petition stated a case within the jurisdiction of the court must be considered. The question thus raised is one of the greatest importance, involving questions of the respective rights and powers of the United States and of the states. The questions are—*First,* whether congress has the constitutional power to pass an act limiting the liability of the owners of vessels engaged only in commerce between ports of the state of New York, but carried on upon the high seas or navigable waters of the United States; and, *secondly,* whether, if congress has this power, it has exercised it in the act known as the limited liability act, (St. 1851, c. 43, now Rev. St. 4282 *et seq.*;) and, *thirdly,* if congress has not that legislative power, or has not exercised it, whether in this case, by the maritime law of the United States as it now is, the petitioner is entitled to a decree limiting its liability in a case not within the terms of the statute

referred to. The contention of the claimants who appear to object to the jurisdiction is that this act is merely a regulation of commerce, so intended by congress, and to be so construed, and therefore inapplicable to vessels engaged exclusively in the commerce of a state, though carried on upon the navigable waters of the United States; and that, if not so intended, but if the act must be construed as applying to such vessels, that it is unconstitutional in respect to such vessels for want of authority in congress to pass it. The question of the constitutional power of congress to pass the act as applied to such vessels is obviously the first question to be considered, because this assumed want of power is urged as one of the strongest reasons bearing on the further question of the proper construction to be given to the statute. The contention on the part of the petitioner is that, while in its application to vessels of the United States engaged in foreign and interstate commerce the act may be justified by and based upon the power granted to congress to regulate commerce among the states and with foreign countries, yet the act was the adoption by congress of a principle of the general maritime law not before expressly recognized or adopted as part of the maritime law of the United States, but which it was competent for congress to adopt and make a part of the maritime law of the United States; that thereupon it became operative over all the navigable waters of the United States, and applicable to all vessels of the United States, or of any of the states engaged in navigating such waters or the high seas, except so far as such waters or particular classes of such vessels are expressly excepted from its operation. The exception in the act is that it shall not apply to "the owners of any canal-boat, barge, or lighter, or to any vessel of any description whatsoever used in rivers or inland navigation." The effect of this exception will be more properly considered hereafter in discussing the construction of the act.

Article 3, § 2, of the constitution declares that the judicial power shall extend to "all cases of admiralty and maritime jurisdiction." Two of the principal classes of "cases of admiralty and maritime jurisdiction," everywhere recognized and

acknowledged to be such, are cases for breach of maritime contracts and cases for damages growing out of marine torts. The admiralty jurisdiction in cases of maritime contracts depends on the nature of the contract,—its maritime character,—not on the place where it is made or to be performed. While it is often a difficult question whether a contract is maritime or not, no such question is involved in this case, because contracts for the carriage of goods and of persons on the sea or tide-water, whether within or beyond the limits of a particular state, are beyond all question maritime contracts of which the admiralty has jurisdiction. Maritime torts, on the other hand, are all injuries, trespasses, and unlawful or injurious acts done and committed on the sea or navigable water connected with the ocean. Their character as maritime depends exclusively on the place where they are committed. While there are serious questions as to what waters are properly to be included under the term navigable waters, or waters connected with the sea, there is no question that the waters over which this vessel ran are subject to the admiralty jurisdiction, and that all torts there committed are marine torts. These propositions are so well settled that it is necessary to refer to a few only of the cases in which they have been adjudged: *The Propeller Commerce,* 1 Black, 579–580; *The Plymouth,* 3 Wall. 20, 35, 36; *N. J. Steam Nav. Co.* v. *Merchants' Bank,* 6 How. 344; *Ins. Co.* v. *Dunham,* 11 Wall. 22 *et seq.* The judiciary act of 1789 (1 St. 77) conferred on the district courts of the United States "exclusive original cognizance of civil causes of admiralty and maritime jurisdiction, * * * saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it." There can be no question that among the cases of admiralty and maritime jurisdiction of which cognizance was thus granted to the district courts of the United States, were cases arising upon maritime contracts to be performed between ports of the same state, and maritime torts committed in the course of commercial transactions carried on between the different ports of the same state. The states before forming the federal government had their admiralty courts, which took

cognizance of such cases; and all admiralty and maritime cases, as well those arising in the strictly domestic as in the foreign commerce of the states, were included in this grant. *The Propeller Commerce, ut supra; The Belfast,* 7 Wall. 636–640; and *The Mary Washington,* 5 Am. Reg. 695.   There is, then, a class of cases to which the admiralty jurisdiction extends which is outside of the constitutional power of congress in respect to the regulation of commerce; because, while they are undoubted cases of maritime contract or marine tort, they arise in the prosecution of domestic commerce of a state on the navigable waters of the United States.   All the claims which have been presented in this case are claims for a marine tort.   The causes of action sought to be enforced by the several objecting parties unquestionably grow out of the alleged misconduct or tortious action of the owners of this steam-boat, or their servants, or agents—the master and crew —upon the navigable waters of the United States, whereby the fire and loss and destruction of the property on board were occasioned, or the passengers who are suing, or who wish to sue, or whose representatives are suing, or wish to sue, were injured or killed.   Whether their actions are or may be framed in contract for breach of a contract to carry, or in tort for negligence, they are equally maritime from their nature, or the place of the injury.

It is contended, on behalf of some of these claimants who have commenced suits under a state statute giving the administrator or the relatives of a person killed by the negligence of another the right to recover damages caused by the negligent act which resulted in death, that their causes of action are not maritime nor cognizable in this court.   I think in this they are mistaken.   The cause of action is still maritime, however the right of the party entitled to sue upon is derived.   Neither congress nor a state can make a contract maritime which is not so, nor take from a maritime contract its maritime character.   *The Belfast,* 7 Wall. 624. The same principle manifestly applies to torts.   The cause of action in these cases is a wrong committed and consummated on navigable waters.   This stamps it as a marine tort.

There may be a cause of action growing out of such a disaster as this of which the admiralty court would have no jurisdiction, because the wrong might happen to be consummated not on the water but on the land, as in case the fire is communicated to buildings on the land or results in injuring a person on the land. *The Plymouth, ut supra; The Epsilon,* 6 Ben. 378. None of the claims of the parties who have appeared in this case, however, are of that character. It has been seriously doubted whether the rule of the common law, that a cause of action for an injury to the person dies with the person, is also the rule of the maritime law. There is some authority for the proposition that it is not, and that in admiralty a suit for damage in such a case survives. *The Sea Gull,* 2 L. T. R. 15; *Cutting* v. *Seabury,* 1 Sprague, 522; *The Guldfaxe,* 19 L. T. R. 748; *The Epsilon,* 6 Ben. 381. But, however it may be in respect to the original jurisdiction of admiralty courts, I see no valid reason why the right of a person to whom, under the municipal law governing the place of the transaction and the parties to it, the title to the chose in action survives or a new right to sue is given for damages resulting from a tort, the admiralty courts, in the exercise of their jurisdiction *in personam* over marine torts, should not recognize and enforce the right so given. It has been held by the supreme court that such legislation by a state as applied to marine torts does not, in the absence of a commercial regulation by congress covering the same field, intrench upon the exclusive powers given to the general government. *Steam-boat Co.* v. *Chase,* 16 Wall. 522. Such a statute, of course, can confer no right as against persons not subject in any way to the jurisdiction of the state whose law confers such right of action. *Crapo* v. *Allen,* 1 Sprague, 184. But in general it seems that the courts of admiralty are bound to recognize the rights of property as established by competent state authority, and so far as they have jurisdiction *in rem* or *in personam,* as the case may be, in cases of maritime contracts or marine torts, to enforce the rights of parties according to the title so derived. A familiar illustration of this

principle is, as it seems to me, the enforcement of a lien for repairs to a domestic vessel created by the state law in a case where the maritime law gives no lien. The lien thus created is purely the creation of the local statute. It is not a maritime lien. Yet, because the contract to which it is made appurtenant is a maritime contract, the admiralty court has jurisdiction of the case, and will adopt, for the purpose of enforcing the right thus given to the party, such of its processess as are appropriate for securing to the owner the benefit of it. *The General Smith,* 4 Wheat. 438; *The Lottawanna,* 21 Wall. 580. The title to ships passes, as in cases of other chattels, to an administrator. But if any state should choose to enact that the title to an interest in a vessel held by its citizens should on their death, intestate, pass like real estate to their heirs at law, I know of no ground on which a court of admiralty could refuse to recognize the title so made. A doubt has been expressed by the supreme court in one case whether such a statutory action for a marine tort will lie in the admiralty. *Steam-boat Co.* v. *Chase,* 16 Wall. 532. The case, however, did not call for the decision of the question, as the court observed. In the case of *Crapo* v. *Allen, ut supra,* Judge Sprague, while holding that the statute had no application to the party before him because not within the jurisdiction of the state, expressed the opinion that such an action *in personam* would not lie. But notwithstanding these authorities, which certainly are not conclusive against it, I have reached the conclusion that a court of admiralty can, in the absence of any conflicting legislation on the part of congress, enforce such statutory claim for damages *in personam* for a marine tort; that such is the proper and logical result of the principle which leads the admiralty courts always in the exercise of their jurisdiction to recognize and enforce the rights of the parties to maritime contracts created by any competent authority. And I can see nothing in the rules of the admiralty applicable to torts which should except them from the like beneficial principle. Nor does there seem to be any valid distinction in this respect as to the powers of the court between suits *in personam* and suits *in rem.* In

general, a valid claim for a marine tort against the owners gives a maritime lien upon the offending vessel. Since writing the foregoing, I find the same views expressed and ably enforced by Judge Deady in *Holmes* v. *O. & C. R. Co.* 5 FED. REP. 75. The claims against the owners of this steam-boat, then, being all of a maritime character of which this court has jurisdiction, and she being engaged in the domestic commerce of this state, the question is whether congress has the constitutional power to pass a statute declaring that the limit of the liability of the owners upon all the claims for loss arising out of this disaster, happening without their privity or knowledge, shall be the value of the vessel and her pending freight upon their surrendering the same. This statute came before the supreme court for consideration in the case of *Norwich Co.* v. *Wright*, 13 Wall. 104. The court there distinctly held that, so far as this statute limits the liability of the ship-owner for the torts of the master and crew upon the surrender of the vessel and her pending freight, the rule of the statute was the rule of the general maritime law. The statute, perhaps, gives in certain cases relief where the ship and freight are not surrendered *in specie*, and in that respect may go beyond the rule of the maritime law; but such cases need not now be considered, since in this case a surrender of the vessel was made and there was no freight to be surrendered. The court also held that the statute, in giving the ship-owner a right to take "appropriate proceedings in any court to enforce his claim for limitation of liability," by necessary implication gave him the right to take those proceedings in the district courts of the United States which are vested with exclusive jurisdiction in all maritime and admiralty causes, saving to suitors in all cases a common-law remedy where the common law is competent to give it. The district courts, and they alone, were held to be the courts competent to exercise the jurisdiction over such cases, because the causes were maritime in their nature, and the relief to be given was not a remedy which the common law was competent to give.

In reference to the rule of limitation of liability on surrender of the vessel and the freight being already the rule of

the general maritime law, the court say, (p. 127:) "We do not hesitate to express our decided convictions that the rule of the maritime law on this subject, so far as relates to torts, was intended to be adopted by the act of 1851," (and see the careful discussion of this question on authority, pp. 116 to 122.) It may be assumed, for the purpose of considering this question, that prior to the act of 1851 this principle or rule of liability of the general maritime law had not been adopted as part of the maritime law of the United States. For if, before that act, it was part of the maritime law of the United States, there would be no question to discuss; because, if it were already part of the maritime law of the United States, unquestionably it must be applied by the admiralty courts of the United States in all cases of marine torts committed on the navigable waters of the United States, or on the high seas. On this subject, and as the result of a most exhaustive discussion of the subject, commended by the supreme court in *Norwich Co.* v. *Wright*, Judge Ware, in the case of *The Rebecca*, 1 Ware, 207, says: "The general sense of the commercial world seems to be satisfied with holding the owners of vessels responsible to the extent of their interest in the ship, and by abandoning the ship and freight to the creditors they are discharged. This has for a long period, if I am not mistaken, been the law of all the maritime nations of the continent of Europe, with respect to damages arising from the wrongful and illegal acts of the master. It however has never been acknowledged in England, or this country, as customary law, though it seems that the sense of the commercial community is in favor of this limitation of the owner's responsibility for the tortious acts of the master. And, accordingly, on the petition of merchants and ship-owners, it has in a number of particulars been established in England by acts of parliament. We have in this country no act of the general government on the subject, but a similar limitation of the responsibility of the owners has been established by legislative authority in the states of Massachusets and Maine."

The constitution provides that "the judicial power of the United States shall extend   *   *   *   to all cases of admi-

ralty and maritime jurisdiction." It authorizes congress "to make all laws which shall be necessary and proper for carrying into execution  *  *  *  all powers vested by this constitution in the government of the United States, or in any department or officer thereof." Express authority is also given to create courts inferior to the supreme court. Under these provisions of the constitution it cannot be questioned that congress has power to vest in a court of the United States exclusive jurisdiction of admiralty and maritime causes, and to regulate in its discretion the mode of procedure in such courts, and if it sees fit it may provide that all claims growing out of a marine tort, like a fire or collision on a vessel, happening without the privity or knowledge of the owner, shall be heard and tried in a single proceeding or suit, in which all parties interested are summoned to prosecute or defend their claim or interest. This is clearly done by this act; and so far, and if it did nothing more than this, the statute would be a mere statute of procedure of undoubted validity, without regard to power of legislation in respect to interstate and foreign commerce. Has not congress the further power, having entire control over the remedy, to prescribe that in such cases the remedy shall be *in rem* only against the ship and freight, and not *in personam;* that the damages to be recovered in this class of marine torts in the admiralty courts of the United States shall be limited to the value of the ship and freight, and that if the fund is, not sufficient to pay all claims upon it, that it shall be equitably distributed among the claimants? What is this more than prescribing and regulating the remedies to be administered in its own courts? And is there any limitation on such regulation of the remedies which suitors may have in the courts of the United States except the discretion of congress? It seems difficult to say that the power which can give the remedy cannot prescribe its form and its limitation. Under the act of August 23, 1842, (5 St. 518,) the supreme court was authorized to make rules of practice in admiralty. Those rules prescribe the form of remedy to be taken in various classes of cases, whether *in personam* or *in rem,* or both. Rules 12 to 20. It

is true that under those rules an alternative remedy is allowed in most cases, but not in all.   In some cases the proceedings can be *in personam* only, in others *in rem* only.   In one notable instance—the case of a lien by the local law of a state for materials and repairs furnished to a vessel in a home port—the remedy to enforce an undoubted right of lien attached as security to a maritime contract has been given and taken away and again given to suitors in the admiralty courts of the United States by a mere change of the admiralty rules.   All concurrent remedy in the state court to enforce the lien was prohibited by the exclusive character of the jurisdiction given to the admiralty courts, the common-law remedy saved to suitors not being competent for the enforcement of a lien.   *The Lottawanna*, 21 Wall. 559.   It seems to me, therefore, competent for congress, while making the jurisdiction of the admiralty courts exclusive in this class of maritime causes, to direct the courts to exercise that jurisdiction only *in rem* and not *in personam;* to provide for this class of marine torts that there shall be a remedy only against the ship and freight, or, if against the person, only to the value of the ship and freight; that such an act would be within constitutional power of congress to erect tribunals inferior to the supreme court, and to prescribe their jurisdiction and powers, and the remedies which suitors in those courts shall be entitled to.   Thus, Chief Justice Taney says, in *The St. Lawrence*, 1 Blatchf. 527: "Yet congress may undoubtedly prescribe the forms and modes of proceeding in the judicial tribunals it establishes to carry this power (the judicial power) into execution, and may authorize the court to proceed by an attachment against the property or by the arrest of the person, as the legislature shall deem most expedient to promote the purposes of justice."

Aside from this power of congress to prescribe what remedies suitors in the courts of the United States may enjoy, it has been suggested by the supreme court that perhaps congress may adopt by legislative act, as part of the maritime law of the United States, a rule or principle of the general maritime law not before adopted as part of our maritime law.

Thus it is suggested, in the case of *The Lottawanna*, that congress might, by law, adopt as a uniform rule for the whole country that rule of the general maritime law that material men shall have a lien for materials and supplies furnished to a vessel in its home port. *The Lottawanna*, 21 Wall. 577. The court in the same case also say: "Perhaps the maritime law is more uniformly followed by the commercial nations than the civil and common laws are by those who use them. But like those laws, however fixed, definite, and beneficial the theoretical code of maritime law may be, it can have only so far the effect of law in any country as it is permitted to have. But the actual maritime law can hardly be said to have a fixed and definite form as to all the subjects which may be embraced within its scope. Whilst it is true that the great mass of maritime law is the same in all commercial countries, yet in each country peculiarities exist either as to some of the rules, or in the mode of enforcing them. * * * No one doubts that every nation may adopt its own maritime code. France may adopt one, England another, the United States a third; still the convenience of the commercial world, bound together as it is by mutual relations of trade and intercourse, demands that in all essential things wherein those relations bring them in contact, there should be a uniform law founded on natural reason and justice. Hence the adoption by all commercial nations (our own included) of the general maritime law as the basis and groundwork of all their maritime regulations. But no nation regards itself as precluded from making occasional modifications suited to its locality and the genius of its own people and institutions, especially in matters that are of merely local and municipal consequence, and do not affect other nations. * * * Each state adopts the maritime law, not as a code having any independent or inherent force *proprio vigore*, but as its own law, with such modifications and qualifications as it sees fit. Thus adopted and thus qualified in each case, it becomes the maritime law of the particular nation that adopts it. And without such voluntary adoption it would not be the law. And thus it happens that from the general practice of commercial

nations in making the same general law the basis and groundwork of their respective maritime systems, the great mass of maritime law which is thus received by these nations in common comes to be the common maritime law of the world.    *    *    *    The question as to the true limits of maritime law and admiralty jurisdiction is, undoubtedly, as Chief Justice Taney intimates, exclusively a judicial question, and no state law or act of congress can make it broader or (it may be added) narrower than the judicial power may determine those limits to be.    But what the law is within those limits, assuming the general maritime law to be the basis of the system, depends on what has been received as law in the maritime usages of this country, and on such legislation as may have been competent to affect it.    To ascertain, therefore, what the maritime law of this country is, it is not enough to read the French, German, Italian, and other foreign works on the subject, or the codes which they have framed; but we must have regard to our own legal history, constitution, legislation, usages, and adjudications as well.    The decisions of this court illustrative of these sources, and giving construction to the laws and constitution, are especially to be considered; and when these fail us we must resort to the principles by which they have been governed.    But we must always remember that the court cannot make the law: it can only declare it.    If within its proper scope any change is desired in its rules other than those of procedure, it must be made by the legislative department.    It cannot be supposed that the framers of the constitution contemplated that the law should forever remain unalterable."

The court then refers to the power of congress to regulate commerce, and its authority under that power, if no other, to introduce such changes as are likely to be needed, and refers to the laws for the registry of vessels, recording bills of sale and mortgages of vessels, the rights and duties of seamen, the limitation of the responsibilities of ship-owners, and "many other things of a character truly maritime," as illustrations of legislation within the power to regulate commerce, modifying the maritime law of the United States.    It is in the same

connection that the suggestion above quoted is made relative to the power of congress to pass an act giving material men a lien on domestic vessels of uniform operation throughout the United States. And the court does not seem to limit this suggestion to vessels which are engaged in interstate and foreign commerce. We would not press these observations of the court beyond their fair meaning and intent, but they certainly seem to afford support for the proposition, that, independently of the express power given to congress to regulate commerce with foreign countries and between the states, it has also authority, under those clauses in the constitution which commit to the judicial power of the United States all cases of admiralty and maritime jurisdiction, and power, to pass laws to carry this power into effect, to adopt, as part of the maritime law of the United States, a rule or principle of the general maritime law which has not heretofore been adopted as part of our maritime law. Before the formation of the Union, undoubtedly, the several states could exercise this power, and could, by legislation, change the maritime law of the state as they saw fit. If congress cannot exercise the power outside the range of foreign and interstate commerce, then there is no authority to make such changes, directly and by legislation, in the maritime law of the United States. The adoption of the constitution adopted a uniform maritime law of the United States, regardless of all differences in the maritime law of the several states, which thereafter became merely important as illustrative of the question, what, on particular topics, was the prevailing maritime law of the whole country. The courts, under the judicial power, have no authority to change that law first adopted. The states can no longer modify the maritime law. Is it possible that such power to change was left unprovided for in the constitution? that, while full authority is given to regulate foreign and interstate commerce, yet, without the range of those subjects which do not cover the whole field of admiralty and maritime jurisdiction committed to the judicial power of the nation, change is no longer possible? These considerations and the views of the supreme court above quoted, taken in connection with the

fact that congress has the power in its discretion to give or withhold from suitors in the courts of the United States particular remedies, it seems to me, make it a fair question for discussion whether congress has not the general power to adopt, from the general maritime law, an existing rule or principle of that law, and to make it, as part of the maritime law of the United States, a uniform rule of decision in the admiralty courts of the United States, independently of the power of congress to regulate commerce between the states and with foreign countries. In one of the latest decisions of the supreme court, under this very statute, (*Lord* v. *Steamship Co.*, Oct. term, 1880,) which was the case of a vessel engaged in commerce between San Francisco and San Diego, the court held the statute applicable on the ground that commerce upon the ocean, and beyond the territorial limits of any state, must be regarded as foreign commerce, although the persons and things carried were not in transit between the states, or to or from foreign countries, and that therefore the statute could have effect in that case as a regulation of commerce. But the chief justice, in giving the opinion of the court, recognizing the fact that the question of the effect of the statute might arise in a case where the commercial power of congress would not apply, makes the following saving observation in respect to this statute: "Having found ample authority for the act as it now stands in the commercial clause of the constitution, it is unnecessary to consider whether it is within the judicial power of the United States over cases of admiralty and maritime jurisdiction." By this I understand the court to intimate that they consider it an open question whether, independently of the power to regulate commerce, the statute could be justified under the clauses of the constitution above referred to, vesting the judicial power in all admiralty and maritime causes in the courts of the United States, and giving congress power to legislate to carry into effect this clause. The question thus foreshadowed by the supreme court has actually arisen for decision in this case; and, after giving the matter a careful consideration, I am of opinion that the statute can thus take effect independently

of its being a regulation of commerce, as an act prescribing and limiting the remedies to be enjoyed by suitors in the admiralty courts of the United States. Whether it can, under the same clauses of the constitution, be justified as the exercise by congress of a general power to change the maritime law of the United States, it is unnecessary in this case to determine.

Coming, then, to the question of the actual construction to be given to this statute, the question is whether it is to be held to be merely a regulation of commerce, interstate and foreign. There is nothing in the act itself, it seems to me, that indicates that it was intended by congress to be so restricted in its operation. The cases excepted out of its operation—"any canal-boat, barge, lighter, or any vessel of any description whatsoever, used on rivers or inland navigation"— are not cases of vessels engaged exclusively in commerce of a single state. It has been held that vessels navigating the great lakes are not within the exception. *Moore* v. *Nav. Co.* 24 How. 1. So far as the exception indicates a general purpose to distinguish between different waters, as those within and those without the operation of the act, the line is drawn between the external waters of the country, the sea and bodies of waters so vast as to be like the sea for purposes of navigation, and their immediately-connected waters on the one hand, and strictly fluvial or interior waters on the other hand, or between waters adapted to sea-going vessels and waters not so adapted. That the waters of Long Island sound are not within the exception is too plain on authority and on the reason of the thing to admit of discussion. *Moore* v. *Nav. Co.* *ut supra; The Epilson, ut supra; Norwich Co.* v. *Wright, ut supra.* This exception, so far as it has any bearing on the intention as to the general operation of the act, seems to me to indicate that the purpose was to extend the act to all external waters, and to all sea-going vessels navigating them, to which the power of congress to legislate in this respect extended. The maxim *expressio unius, exclusio alterius* applies. As the terms of the act purport to extend generally to all vessels navigating the navigable waters of the United

States, and an express exception is made of certain vessels navigating certain of those waters, the inference is proper that no other vessels navigating the waters not excepted were intended to be excepted out of the act. If, indeed, there were any strong reason or settled policy of the government for excluding vessels running between port and port of the same state, such further exception might be implied. But there seems to be no such reason or settled policy. Why do not the same considerations which make the law just and right, as applied to a vessel running between New York and Stonington, or between Boston and Portland, make it also just and right as applied to a vessel running between New York and Sag Harbor, or between Boston and Provicetown, or Nantucket; assuming, of course, that congress has equal power in both cases? That the act was not intended to except vessels trading exclusively between ports of the same state, if, in their voyages, they passed beyond the territorial limits of the state, has been now conclusively determined by the supreme court. *Lord* v. *Steam-ship Co. ut supra*. I think no sufficient reason exists for such discrimination, and that there is no reason of public policy which should, without an expressed exception, exclude vessels running between ports of a single state from the beneficial operation of this rule of damages, and this restriction of remedies thus adopted by congress for the government of the admiralty courts of the United States, nor from the operation of this newly-adopted rule of the maritime law, if the statute can take effect as the adoption of a new rule of the maritime law.

Uniformity in the maritime law is one of its peculiar charteristics,—one of the things which makes it most beneficent in its operation; and the great benefits to result from such uniformity in the maritime law, as administered in the courts of the Union, was one of the inducements to the adoption of the constitution, and the controlling reason for conferring on the general government the exclusive jurisdiction of all admiralty and maritime causes,—as well those arising in the commerce of the state on navigable waters as those arising in interstate and foreign commerce. It is true that it has

been assumed, in some cases of great authority, that this statute was passed under the power given to congress to regulate interstate and foreign commerce. *Moore* v. *Trans. Co.* 24 How. 1; *Lord* v. *Steam-ship Co.* 4 Sawy. 292. But in both the cases last referred to the vessel in question was engaged in interstate commerce, and as to such vessels it is undoubtedly true that this legislation can be defended as a regulation of commerce. The question, whether it can be defended as a declaration of the maritime law of the United States, was not properly involved in the decision, and does not seem to have been discussed by counsel, and the point is expressly saved by the supreme court in affirming the case last cited. *Lord* v. *Steam-ship Co. ut supra.* In the case of *The British America,* 9 Ben. 516, it was held that the statute could not be resorted to for the purpose of limiting the liability of a foreigner for a collision between an American and a foreign vessel occurring on the high seas and beyond the territorial limits of the United States; yet that the owners of such foreign vessel were entitled to the benefit of the rule of the general maritime law limiting their liability to the value of ship and freight upon the surrender of the same. That decision proceeds, as it seems to me, on the theory that by the statute the general rule of the maritime law has become and been recognized as part of the maritime law to be administered in the admiralty courts of the United States. It will certainly be a very singular result to reach that the owner of the vessels of any foreign nation will have the benefit of the rule, and the vessels engaged in commerce in our own waters will not have the benefit of it. See, also, *Thomassen* v. *Whitwell,* 9 Ben. 403. The case of *The Epsilon, ut supra,* does not seem to have been the case of a vessel engaged in interstate or foreign commerce; but this point does not appear to have been taken or considered.

If, however, the views of the power of congress above expressed are mistaken, and congress has no legislative power in that respect, so that, as positive enactment and *proprio vigore,* the statute must be construed simply as a regulation of commerce, still the question arises whether it has not indi-

rectly affected the maritime law of the United States, and whether the rule of the statute thus made applicable to all foreign and interstate commerce is not *now* the law of the sea to be administered in the courts of the United States. It is for the court to ascertain and declare the existing law of the sea or maritime law as it prevails in the United States, and to administer that law. As pointed out so clearly in the case of *The Lottawanna,* above quoted, that law may be modified from time to time by the adoption of new usages and principles, and especially by the adoption by maritime states, by their statutes, codes, and ordinances, of rules which, in other maritime countries, already form part of the law of the sea as accepted and practiced upon by them. If now the United States, by act of congress, has, so far as the legislative power is committed to congress, adopted this rule of the maritime law, and made it applicable to all its external navigable waters, and to all sea-going ships and vessels engaged in foreign and interstate commerce, the courts of admiralty cannot overlook this fact in determining the question whether this rule is now part of the maritime law of the United States. It is, perhaps, to this indirect operation of the laws of congress regulating commerce, in showing the adhesion of the United States to principles of the general maritime law, that the observations of the court in the case of *The Lottawanna* were designed to be applied. It does seem to me that on a question, whether an admitted rule of the general maritime law has become adopted as part of the maritime law of the United States, the fact that within the utmost range of its power to regulate commerce congress has expressly enacted it, should be a controlling circumstance with the courts.

Other illustrations exist of the modification of the law of the sea in this mode. The rules as to the lights which vessels should carry at sea at night are purely artificial. They have their origin in the absolute necessity from reasons of safety for some general rules to be adhered to by all maritime nations. This is true as to the rule of the port helm, and generally as to the rules for the steering of vessels to avoid collisions in meeting or crossing, though these rules are not

purely artificial and arbitrary rules like those regulating the lights to be carried. These rules have been made operative by act of congress. Are the rule of the port helm and the rule of the colored side lights, as prescribed by act of congress, merely regulations of foreign and interstate commerce? They undoubtedly are regulations of commerce, and as such binding as matter of positive law on American ships engaged in interstate and foreign commerce while within the territorial limits of the United States. But the supreme court has expressly held, as to the rule of the lights to be carried at sea, that since the adoption of the rule by congress, it may be as a regulation of commerce, the rule is to be regarded as the rule of the sea—a part of the maritime law of the United States to be administered in its admiralty courts. *The Scotia,* 14 Wall. 187. The court there says: "Undoubtedly, no single nation can change the law of the sea. That law is of universal obligation, and no statute of one or two nations can create obligations for the world. Like all the laws of nations, it rests upon the consent of civilized communities. It is of force, not because it was prescribed by any superior power, but because it has been generally accepted as a rule of conduct. Whatever may have been its origin, whether in the usages of navigation or in the ordinances of maritime states, or in both, it has become the law of the sea only by the concurrent sanction of those nations who may be said to constitute the commercial world. Many of the usages which prevail, and which have the force of law, doubtless originated in the positive prescriptions of some single state, which were at first of limited effect, but which, when generally accepted, became of universal obligation. * * * And it is evident that unless general assent is efficacious to give sanction to international law, there never can be that growth and development of maritime rules which the constant changes in the instruments and necessities of navigation require. Changes in nautical rules have taken place. How have they been accomplished, if not by the concurrent assent, express or understood, of maritime nations? When, therefore, we find such rules of navigation as are mentioned in the British orders in

council of January 9, 1863, and in our act of congress of 1864, accepted as obligatory rules by more than 30 of the principal commercial states of the world, including almost all which have any shipping on the Atlantic ocean, we are constrained to regard them as in part, at least, and so far as relates to these vessels, the laws of the sea, and as having been the law at the time when the collision of which the libellants complain took place. This is not giving to the statutes of any nation extraterritorial effect. It is not treating them as general maritime laws, but it is a recognition of the historical fact that by common consent of mankind these rules have been acquiesced in as of general obligation. Of that fact we think we may take judicial notice." By what principle are vessels plying between ports of the same state on strictly domestic state commerce held bound by the steering rules and the rules as to lights laid down in the act of congress, as they constantly are in collision cases in this court without question? The reason is furnished by the decision of the court in the case of *The Scotia*, that these rules have become the law of the sea; and their adoption by congress, at any rate so far as its power to regulate commerce extends, is the most satisfactory proof that they have become part of the maritime law of the United States as well as that of other commercial nations, and it is not necessary to suggest in defence of the application of these rules to such domestic vessels, as was done in the case of *The Bright Star*, 1 Woolw. 270, that the protection of the inter-state and foreign commerce traversing the same waters gives congress the incidental power to impose them as rules of statutory obligation on these strictly domestic ships. See, also, *The Eleonora*, 17 Blatchf. 88. I am, therefore, of opinion that, in any view of the statute and of the powers of congress to which it is to be attributed, the rule of limitation of liability on the surrender of the vessel and freight is part of the maritime law of the United States, and the rule of liability to be administered in this court; and therefore the exceptions to the jurisdiction of the court are overruled, and the motions to dismiss the original libel and set aside the monition must be denied

It is insisted, however, on the part of parties who have commenced suits for personal damage, and also by those who have commenced suits as administrators under the state statutes, that their claims are not liable to be cut off by a decree in this case, and that the restraining order as to them should be set aside. The question, whether a claim for personal injuries is within the statute, was carefully examined in the case of *The Epsilon, ut supra,* and I see no reason to dissent from the conclusion of Judge Benedict in that case. I do not understand that it is held in that case, as argued in this, that such parties cannot share in the fund. On the contrary, so far as that point is touched upon, the opinion of the court was to the effect that they could share in it. On the authority of that case, and on what is hereinbefore said as to the nature of these claims and the claims for damages by administrators or relatives of persons killed, I am of opinion that they cannot be distinguished from claims arising out of loss of cargo. It is insisted, also, that by section 4493 of Revised Statutes damages to the person or by loss of baggage are taken out of the operation of the limited liability act. I think it is clear that this is not so, but that in any case to which section 4493 applies, in order that the owner may have the benefit of the limited liability, the damages must not have happened through any neglect or failure to comply with the regulations of the statutes relating to steam-vessels, nor through known defects of the steaming apparatus or hull. To this extent this section modifies the act, but both are re-enacted as parts of the Revised Statutes, and there is no difficulty in giving them both their proper effect. It is very clear, also, that the provision in this section that in such cases parties injured may recover their full damages, is consistent only with the theory that, by other provisions of law, the liability to passengers for personal injury and loss of baggage was subject to some limitation.

The objections that these objecting parties are entitled to have their cases tried by a jury, and that the right is reserved to them as part of their common-law remedies by the judiciary act, (Rev. St. § 563,) are clearly answered by the sugges-

tion that in *all maritime* causes, of which this is one, it is wholly within the discretion of congress to make the jurisdiction of the courts of the United States exclusive, and that this statute does make it exclusive for the purpose of determining the question of the existence and extent of the owner's liability for the disaster from the time of the transfer of the property to a trustee after the filing of the petition, (Rev. St. § 4285,) and that congress has not seen fit to provide for a trial by jury in the admiralty courts, except in a limited form in the circuit court.   18 St. 315, *c.* 77.   The statute expressly says that from and after such transfer "all claims and proceedings against the owner shall cease."   This language has been held by this court to mean that all suits for such damages shall cease, (*The Oceanus,* 6 Ben. 258;) and so the supreme court evidently understood it when they framed their rules under the act, and made a restraining order a regular part of the proceedings.   *Norwich Co.* v. *Wright,* 13 Wall. 125; Rule 54, 13 Wall. 13.   Although the decision of this court was not followed by the supreme court of Massachusetts, it seems to me to be clearly right, and will be adhered to unless overruled.   *Hill Manuf'g Co.* v. *Steamship Co.* 113 Mass. 495. The construction of the statute and of the rules suggested by the Massachusetts court, that the claims and proceedings that are to cease are only those pending in the federal courts, would, it seems to me, in effect, nullify the statute and destroy its intended operation in case any claimant of damage had been diligent enough to commence his action in the state court before the filing of the petition in the district court. And the fifty-fourth rule, as interpreted by this court,—that is, as applying to suits commenced in state courts,—is in exact accordance with the declared intention of the supreme court as to the rules they had prepared, but had not then promulgated.   *Norwich Co.* v. *Wright, ut supra,* 125.   It is not necessary to claim that, after a determination by the district court upon the question of liability, if in favor of the owner, the district court can or would, by its final decree, restrain any parties from going on with or commencing any suit against the owner.   It may be that after a decree the owners must

avail themselves of the decree as a defence in the state court, if it is in their favor, as in case of a discharge in bankruptcy. If the decision of this court is against the owner on the ground that the damage did not occur without his privity or knowledge, or without that kind and a measure of negligence mentioned in section 4493, then the decree of this court dismissing the petition on the merits will be an equally conclusive determination of the question of negligence in favor of the passenger or shipper of cargo in his suit in the state court. But to argue that a passenger or shipper can maintain a suit in the state court pending the proceeding in this court, because the complaint in the state court alleges a case of damage or loss occurring with the privity or knowledge of the owner, or by his negligence, and therefore not a case within the protection of the statute, is to overlook the fact that the chief object of the statute was to submit that very question, whether the damage or loss was so incurred, once for all, and as between the owners and all the passengers and shippers, to the admiralty court; and that it was to make the jurisdiction of this court to determine that question effectual, that the statute provided that upon the institution of the proceeding and the transfer of the vessel, all claims and proceedings against the owner should cease.

It was argued that the arrangement of the statute into sections in the Revised Statutes showed more clearly than the original statute an intention to except out of its operation injuries to the person. Such an inference as to the construction from the arrangement of the statutes in sections is inconsistent with Rev. St. § 5600; and, in general, in the construction of the Revised Statutes an intention to change the existing laws, which this revision purports to re-enact or codify, is not to be presumed from trifling changes of phraseology. The presumption is against an intended change of construction, unless that intention to change the law is clearly apparent. Rev. St. §§ 5595–5601.

But it is still insisted, as to the restraining order, that whatever may be the jurisdiction of this court it is prohibited by Rev. St. § 720. This section is a re-enactment, with some

change of language, of the fifth section of the act of March 2, 1793. 1 St. 335. The question thus raised, so far as it depended on the original statute of 1793, is disposed of, so far as this court is concerned, in favor of the power to restrain the suits conformably to the rules of the supreme court by the decision in the case of *The Oceanus, (In re Prov., etc., Steamship Co.* 6 Ben. 131.) But the question remains whether the change of language effected in section 720 has taken away this power to restrain suits pending in the state courts. However important this power to restrain pending suits may be as a part of the entire system of relief intended to be given by the statute, as pointed out in the case last cited, yet no such restraining order can be granted against the terms of an express prohibitory law of Congress, and if such prohibitory law exists the ship-owner must be left to apply to the court where the suits are pending, to give effect to that provision of this statute which requires that such suits shall cease, and which is alike the supreme law of the land, to be administered in the courts of the state as well as in those of the United States, or at any rate he must in this respect go without this relief if the federal court cannot grant it, whether he has a remedy elsewhere or not. The original act was, "nor shall a writ of injunction be granted to stay proceedings in any court of a state." As re-enacted the provision is: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state, except where such injunction may be authorized by any law relating to any proceedings in bankruptcy." The question is whether the introduction of this exception into section 720, as to laws relating to bankruptcy, is to be deemed to take away the power to restrain given in the original act by what has been held to be the necessary implication of the words "after such transfer all claims and proceedings against the owner shall cease," which were re-enacted without change in section 4285. Whatever the effect of section 720, section 4285 effectually deprives the state court, before which such claim or proceeding is pending, of all jurisdiction. The only question is, on which court is imposed the duty or conferred the power

to issue a restraining order, if a restraining order shall be necessary to prevent the plaintiff in such suit from proceeding with his suit? It cannot be supposed that this was to remain on the statute book a mere *brutum fulmen*, with no power to carry it into effect and see that it was executed. Clearly, as to any suit pending in a federal court, the duty would remain where it was before, and the court in which the limited liability proceeding was pending would issue the restraining order. It would be so unusual and questionable an exercise of legislative power by congress to make a direction requiring state courts to issue such a restraining order, that I think nothing short of the most explicit declaration of an intent to do so would justify the conclusion that such an intent existed. It is most improbable, too, that the necessary power to carry into effect the grant of exclusive jurisdiction to a court of the United States, clearly intended to be exercised by some authority, should not be conferred upon the court whose jurisdiction and whose suitors are to be defended against interference. It is very likely that the person who framed section 720 overlooked the fact that there was another law in force besides the laws relating to bankruptcy under which the courts of the United States could restrain proceedings already commenced in a state court; but in view of the fact that this other law was embodied in the same revision, that its meaning and force were determined by decisions of the courts, and that it must be presumed to have been re-enacted with the same meaning, I think the change made in section 720 is not sufficient to show an intention to take away anything from the meaning of section 4285. Section 720 has obviously its principal application to the restraint of suits, which, but for the injunction, the state court would have jurisdiction to go on with and determine. This is true with regard to suits against the bankrupt, stayed under the bankrupt law, and generally where a party is by the rules of equity entitled to enjoin a defendant from going on with a prior suit. The peculiarity of this case is that the suit stayed is one in which, by the express terms of an act of congress, the state court is absolutely without jurisdiction to proceed. There are not,

therefore, the same reasons of public policy in this case, as in the cases more particulary provided for in section 720, for prohibiting the issue of the injunction or restraining order. It does not interfere with any exercise of jurisdiction which could otherwise be claimed by the state court, and is not likely to lead to unseemly conflicts between the federal and the state tribunals, to prevent which is understood to have been the original purpose of this prohibitory legislation. So positive is the language of section 4285, that it may be doubted whether, after the transfer therein provided for, the state court could make any order whatever in the cause, even one restraining the plaintiff from its further prosecution. On the whole, therefore, construing the two sections together, I think this court may still restrain, by its order pending this suit, parties who have commenced actions in the state court from proceeding further therein. It is understood that the supreme court will at the present term promulgate new rules regulating the practice in this class of cases. If, in view of the changes made in revising the statutes, they change this rule so as to except suits in the state courts from the restraining order to be issued, these parties will, upon the basis of that modification of the rules, have an early opportunity to renew this motion to vacate the restraining order as to them. If the court continues in force that rule as it now is, it will be a strong if not conclusive authority that section 720 of the Revised Statutes makes no change in the rule necessary. And, whatever doubt there may be about this point of statutory construction, it is satisfactory to feel that no harm is done by the restraining order, since, if it were vacated, these parties would be still prohibited by the act of congress from going on with their suits.

The suggestion that the court which first obtains jurisdiction of a matter has the right to go on and determine the cause, has no force in a case where by a valid statute a court subsequently obtaining jurisdiction is vested with exclusive jurisdiction. And the further suggestion, that the state courts are competent to give the relief to which the owners are entitled, has no force, because no such jurisdiction is given to

the state courts in admiralty and maritime causes, and besides that the provisions of section 4285, which take away their jurisdiction entirely pending this proceeding after transfer, the state courts could not give that relief, even under the saving clause of section 563, since the remedy sought is not a remedy which the common law was competent to give, as pointed out in *Norwich Co.* v. *Wright*, 13 Wall. 123. The supreme court of Massachusetts, indeed, say in the case above cited (113 Mass. 502) that under the statute of that state the ship-owner has a remedy in the nature of a bill in equity. The court evidently overlooked the fact that under section 563, this being a maritime cause, remedies which courts of equity are competent to give, as distinguished from those which courts of common law are competent to give, are not saved to the suitors in the state courts by that section. *The B. F. Woolsey*, 3 Fed. Rep. 457; S. C. circuit court on appeal, 4 Fed. Rep. 552.

These considerations dispose off all the questions presented. Exceptions overruled. Motions to dismiss petition and set aside monition and vacate restraining order denied. All parties who have appeared and have not filed formal claims, or have not answered the amended petition, may file claims and answer within two weeks after notice of the entry of this order.