## Case No. 4,335.

The ELEANORA.

[17 Blatchf. 88; [1] 8 Reporter, 810.]

Circuit Court, S. D. New York. Aug. 28, 1879.

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

Horace Barnard, for libellants.
F. A. Wilcox, for claimants.

WAITE, Circuit Justice. I have had no difficulty in reaching the conclusion that both vessels are responsible for this collision. A simple slackening of speed by a steamer in a fog is not always enough. She must run at a moderate speed (Rev. St. § 4233, rule 21), and is never justified in coming in collision with another vessel, if it be possible to avoid it (Sup. Ins. rule 4). This implies such a speed only as is consistent with the utmost caution. Having complete control of herself, and being capable of so much damage if a collision does take place, the law has imposed on her the obligation of so directing her own movements, in the midst of the uncertainties of a fog at sea, as to be at all times under easy command. If she fails in this she must suffer the consequences. Her rate of speed must be graduated according to the circumstances. The more dense the fog the greater the necessity for moderation. The object is to keep her, if possible, under such control that she can be stopped after another vessel, with which she is in danger of collision, may be seen, or otherwise discovered. She has the right to assume that other vessels will perform their duties and act accordingly, but she has no right to disregard any obligation placed on herself.

Guided by these rules, which are well settled, it is easy to see that the Eleanora was in fault for going at too great a rate of speed. She was running in a dense fog, where the ordinary signal lights were of no use. and objects could not be seen much, if any, more than her own length away. Her officers and men appear to have been watchful on deck, and a vigilant lookout was maintained, but her engineer, at his place in the engine-room, was left to act only on his general orders to slacken speed when the fog whistles were being blown. He did not know whether the fog was dense or not, and he contented himself with opening the furnace doors, to let the steam run down, and shutting off the throttle valve somewhat; how much does not distinctly appear. No orders were given to him from the deck It is true, the witnesses, some of them, say she was going as slow as she could and have her wheels pass the centre; but in this they are evidently mistaken. The fog horn of the Transit was heard before the vessel herself came in sight. As soon as it was heard, the orders to stop and back were given and obeyed. Notwithstanding this the steamer kept on until the schooner came in sight, then ran over the schooner, and then ran again out of sight in the fog, before coming to a stop. In this way the steamer must have run three or four times her length, under a reversed engine, against a head tide of two miles an hour. It needs no argument to show that this could not have been done if, as claimed, when the order to stop and back was given, she was under no more than mere steerage way, or if she had been going, since she came into the fog, at least half an hour before, with her throttle valve to any considerable extent closed. and her steam running down. To my mind it is clear she was doing what

is too often done under such circumstances, taking the risks of running too fast.

As to the Transit I have had no more difficulty than with the steamer. Confessedly, she did not exhibit a torch light. She was sailing in what she knew, or ought to have known, was a common thoroughfare of approaching steam vessels at the time. Their fog signals were heard from various directions, and she was heading on a course crossing their regular tracks. The statutory rule is imperative, that every sailing vessel "shall, on the approach of any steam vessel during the night time, show a lighted torch upon that point or quarter to which such steam vessel shall be approaching." Rev. St. § 4234. No sailing vessel has a right to disregard this regulation because she thinks it unimportant. If she knows of the approach of a steam vessel she must exhibit the light, or take the risks of loss occasioned by its absence.

In this case no attention was paid to the rule. The light was not only not exhibited, but the torch was not brought on deck. If exhibited, possibly it might not have been seen far enough away to have done any good; but such a possibility furnishes no excuse to the vessel for its absence. Nothing short of an absolute certainty that it could do no good, to be established by proof on the trial, will justify an omission to obey the rule. In a fog, all vessels must do all that is required of them by law or usage. While more is demanded of a steamer than a sailing vessel, it is as important that the sailing vessel should obey all the rules prescribed for her, as that the steamer should not neglect those which are to govern her. Actual safety is dependent upon a strict performance by each, of all their respective duties. While the Transit was sailing on her starboard tack, while she was coming about, and while she was on her port tack, fog signals from steamers in her immediate neighborhood were heard, and it is by no means certain that some of them did not come from the Eleanora. It was not proper to assume that the torch light would have done no good. It was her duty to exhibit such a signal, and, under the circumstances of this case, I cannot but consider it a fault that she omitted to do so.

But, even if this were otherwise, her failure to give two blasts of the fog horn while on the port track was, certainly, a fault. The testimony taken since the appeal leaves no doubt on my mind that, when this collision occurred, in 1875, the recommendation of the supervising inspectors in respect to special signals to indicate the course and movements of sailing vessels during a fog, had been adopted by navigators in Long Island Sound and in and about the harbor of New York, as part of their "language of the sea," and that it had been so long in use as to make it a fault on the part of the schooner, if it was not known and understood by those

responsible for her navigation. The supervising inspectors had no power to prescribe rules which would have the force of law, for the government of sailing vessels, and they did not attempt to do so. Their absolute authority did not extend beyond steam vessels, but they certainly had the authority to suggest rules for the consideration of sailing vessels, by which their conduct towards steamers should be regulated, and these rules, if generally acted upon by navigators, might in time become binding, as usages of the sea. The suggestions of the supervising inspectors were eminently practical. They were approved and promulgated by the secretary of the treasury more than four years before this accident. They were immediately taken up and acted upon to some extent. Two years afterwards, extraordinary efforts were made by the government to give them publicity and to secure their observance. It is possible that these efforts had not been put forth at the little port of Port Jefferson, where the Transit was registered, but it is quite certain that the suggestions were known and acted upon in almost every other port she entered from the time of their promulgation until the collision. Under these circumstances, if her officers had not learned of this new sound in fog language at sea, they must be considered as unfit for the positions they occupied, and the consequences of their ignorance must be visited on her. The Eleanora, when she heard the one blast of the fog horn almost ahead, acted as if the vessel from which the sound came was on the starboard tack, and put her wheel to port. This, if the signal had indicated the truth, would have been right, and quite likely would have avoided a collision. As the fact was, the movement was exactly wrong, since it brought the steamer on to the schooner. If the wheel had been put to starboard, and the steamer swung the other way, as would likely have been done if two blasts of the horn had been given instead of one only, a passage under the stern might have been made in safety.

The Transit too was, I think, short handed on deck at the time. While the number of her crew may have been sufficient, and two might have been enough for a watch on deck, under some circumstances, it is easy to see that a mate, who was attending to the navigation of a vessel and letting go her sails while going about in a fog, was in no condition to act as lookout on the watch for the fog signals from steam vessels which might momentarily be expected; and that a man at the wheel, steering the vessel and looking after the sails aft, as they came about, would not be likely to give as much attention to the fog horn as the necessities of the case for the time being required. This is shown by the fact that, although the steamers were due, and approaching from the west, the horn was not sounded in that direction until after the captain came on deck, which was

but just previous to the collision. Until then, the sound in the direction of the danger had been obstructed by the sails. A fog horn, at the best, can be heard only for a comparatively short distance, and is by no means reliable for signal purposes under all circumstances. Hence, it is important that those who are responsible for its use should be vigilant and attentive. As it is the way prescribed by law for giving information as to the position of a sailing vessel in a fog, when sight is of but little use, the duties of the man who has it in charge are as important as those of a lookout under other circumstances. Steamers are bound to keep out of the way of sailing vessels, but sailing vessels must, in the night and in a fog, by the use of the prescribed signals, furnish the steamer with the means of knowing how this may be done. This duty on the part of the sailing vessel is as obligatory as that of the steamer to keep away.

Both vessels being in fault, as between themselves, the damages must be apportioned. Castner and others, who sue the Eleanora alone for the cargo, are entitled, under the rule in this case of The Atlas, 93 U. S. 302, to a decree for the full amount of their loss; and, as the Transit, if she had been joined, would have been liable for one-half this loss, a credit may be allowed the Eleanora, on the decree in favor of the owners of the Transit, for a sum equal to one-half of the damages to the cargo. Although separate libels were filed by the owners of the vessel and the owners of the cargo, they constitute, in effect, but a single suit. They have been heard together and submitted on the same evidence. Having all parties before it, the court may do what it would have done if there had been but one libel, that is to say, divide the damages of the collision throughout between the two colliding vessels. A formal claim, to that effect, on the part of the Eleanora, is not necessary. It is rare that, in any case, a defending vessel makes a demand for a division of damages. A complete defence is generally insisted upon in the pleadings, and the apportionment is made by the court, on the facts as they are finally developed at the hearing. It is unnecessary to decide what the rule in this particular would be if the Eleanora had not been subjected in the suit for the cargo, because here she has been, and that, too, upon the very testimony submitted in the suit between the two vessels. The fund belonging to the Transit, growing out of the collision, is in court, and no injustice is done by using it to reimburse the Eleanora for what she has paid for the Transit, on account of the mutual fault of the two vessels.

While the allowance made by the commissioner in his report for the value of the Transit seems large, I think it is sustained by the evidence. As to the other exceptions to the report in the case of Davis, it is sufficient to say they are overruled. The exceptions in the other case have not been seriously insisted upon here. A decree may be entered in favor of the libellants in the suit of Castner and others, for $1,114.17, and interest at six per cent. from October 25th, 1875, until the date of the decree. In the case of Davis and others, the damage to the vessel and freight amounted to $4,660.14; one-half of this is $2,330.07; deduct one-half of the value of the cargo, $557.08, and the balance due to the Transit is $1,772.99; to which add interest at the rate of six per cent., from October 23d, 1875, to the date of the decree. In the case of Castner, a decree may be entered against the Eleanora for costs in both courts. In the case of Davis, the libellants are entitled to costs in the district court, but, as both parties appealed, the costs in this court may be equally divided between them.