## THE OREGON.[1]

### HOLT and another *v.* THE OREGON.

(*District Court, E. D. Wisconsin.* May 3, 1886.)

1. COLLISION—SCHOONER UNDER SAIL AND SCHOONER IN TOW—ERROR IN LOCATING VESSELS BY SOUND—CHANGE OF COURSE IN FOG.

During a dense fog a collision occurred between the schooner M. and two other schooners in tow of the steamer O. The fog signals of both the steamer O. and the schooner M. were sounded as required by statute, but the M.'s horn was not heard by the O. The O.'s whistle was heard by the M., and endeavors were made to determine her bearing by locating the sound. The O. was first seen by the M. when about 50 feet distant. From the presumed direction of the sound, it was supposed by the M. that the O.'s course was astern of the M., and, as the latter vessel was sailing at a moderate speed, close-hauled, on the starboard tack, no change of course was made until the O. was actually seen. *Held*, that as the steamer's lights could not be seen, sound formed the only guide furnished the M., and that an error in locating sound, under the circumstances, was not a fault; and that as the M. was sailing at a moderate speed, close-hauled, on the starboard tack, the circumstances were such that the master of the M. was justified in concluding that a change of course might increase the hazard.

2. SAME—LIGHTED TORCH—FAILURE TO EXHIBIT, WHEN JUSTIFIED.

The schooner failed to show a lighted torch. It was not proven, to the satisfaction of the court, that the torch, if shown, might not, *possibly*, have been seen. *Held*, that though it be possible that the torch, if shown, might not have been seen far enough off to have done any good, such a possibility furnished no excuse for its absence. Nothing short of an absolute certainty that it could do no good, to be established by proof on the trial, can justify an omission to obey the rule.

3. SAME—FAILURE TO KEEP OUT OF THE WAY, PRIMA FACIE PROOF OF FAULT ON PART OF STEAMER—SPEED IN FOG.

The steamer's speed was diminished upon the coming up of the fog. According to the testimony of her crew, she was, at the time of collision, steam-

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

ing at from three to four knots per hour. According to the testimony of the M.'s witnesses she was steaming at from seven to nine knots per hour. *Held,* that the occurrence of the collision, under the circumstances, was sufficient to establish a *prima facie* case of negligence on the part of the steamer; and that the density of the fog, the locality, and the position of the tow, required an occasional stoppage, in order to listen for sounds from vessels that might possibly be approaching. Both vessels held to be in fault, and damages divided.

In Admiralty.

*Markham & Noyes,* for libelants.

*Harvey D. Goulder,* for claimants.

DYER, J. On the nineteenth day of June, 1885, the schooner Richard Mott set sail from Oconto, laden with a cargo of lumber, bound for Milwaukee. Towards midnight the skies became overcast, and there came up a dense fog, accompanied by rain. The wind was from the south, and was a good sailing breeze. The vessel was sailing by the wind, on the starboard tack, steering S. E. by E., and was carrying full sail. The fog-horn was constantly sounded, and the lights were in their places, and burning brightly. It was mate's watch, consisting of mate, wheelsman, and lookout. At 11:30 o'clock the master came on deck because the weather was thick and threatening. In obedience to his orders, the watch below were called to shorten sail. The whistle of a steamer was heard, apparently at considerable distance, bearing southwest, and then a little more westward, from the Mott. Sail was taken in, the vessel keeping her course, and the steamer's whistle continuing to be heard. No lights were seen, when suddenly the steamer, which proved to be the Oregon, loomed up in the fog, passing within about 50 feet of the schooner's bow. A hail was heard from the steamer to the effect that she had a tow, and to put the wheel of the Mott hard down. This was done, and she came up in the wind. Almost immediately the first schooner in tow of the Oregon, which was the Cyclone, struck the Mott, carrying away her jib-boom. Then the second schooner in the tow, which was the Locke, in a moment or two struck her a second blow, raking her fore and aft, from stem to stern post, doing serious damage. Both blows were received by the Mott on her port side, as she was standing in the wind heading nearly south. The collision occurred about 15 or 20 minutes past midnight, Milwaukee time,—perhaps a few minutes later. For the injury thus occasioned the libelants seek to recover damages, and the question is, which vessel, if either, was in fault?

1. Was the steamer chargeable with negligence? It is insisted on the part of the claimants that, so far as she was concerned, this was an inevitable accident. In the case of a steamer having opportunity to know that a sailing vessel is approaching, the rule is that the steamer is bound to keep out of the way. Whatever is necessary for this, it is her duty to do. *The Fannie,* 11 Wall. 240. When a

steamer approaches a sailing vessel, the steamer is required to exercise the necessary precaution to avoid a collision, and if this be not done, *prima facie* the steamer is chargeable with fault. *The Oregon*, 18 How. 570. In the case of *The Carroll*, 8 Wall. 304, it was said: "As the steamer did not keep out of the way, and as the collision did occur, the steamer is *prima facie* liable, and can only relieve herself by showing that the accident was inevitable, or was caused by the culpable negligence of the schooner." Many other cases to the same effect might be cited.

The Oregon, with her tow, was on a voyage from Milwaukee to Escanaba, and was heading about N. N. E. I do not think she changed her course after her whistle was first heard on the Mott, as was supposed by the master of the Mott. The testimony on the part of the claimants is positive that she did not. The course of the wind may have been such as to carry the sound of the whistle more to the westward than northward, and thus to mislead those on the Mott. Her lights were in place, and burning, as were those on the vessels in tow. Her fog-whistle appears to have been diligently sounded at frequent intervals. There was no omission of duty in these respects. The fog-horn of the Mott was not heard until the vessels were in sight of each other, and close together. This would naturally suggest a negligent lookout, and it appears that the person serving in that capacity was a young man less than 19 years old. But the master and mate were also on watch, and the testimony is direct and positive that attention was given to fog signals, and that none were heard. As the wind was from the south, its tendency would be to carry the sound of the Mott's horn away from the Oregon, and make it more difficult to hear on the steamer. Then, the master says the machinery of the boat made a good deal of noise, and thus it is easy to see that the situation was not favorable for hearing sounds from an approaching vessel.

Without imputing fault to those on board the Oregon on either of the grounds already mentioned, I am still of opinion that the fact of the collision cannot be reconciled with the exercise of due care on the part of the steamer. Notwithstanding the testimony which tends to show that her speed was checked after the fog came on, I cannot resist the belief that she was going at greater speed than was consistent with safety, and that this was the prime cause of the colliding vessels being brought into dangerous proximity. The master says the fog was so dense that he could not see the tow behind him. As the steamer had a tow of two schooners, there was imposed upon her the necessity and duty of greatly increased vigilance and care since there was liability to collision with the vessels in tow as well as with the steamer itself. In the case of *The Favorite*, 10 Biss. 536, S. C. 9 Fed. Rep. 709, it was held by Judge BLODGETT that the fact that a steamer has barges in tow does not alter the rule requiring her to keep out of the way of an approaching sailing vessel, and that in such a case

-the steamer should take extra and timely precautions to avoid a collis-ion. In effect, the same ruling was made in *The Civilta*, 103 U. S. 699. The chief engineer of the Oregon says she was running between three and four miles an hour; but he was not on duty, and merely looked out of his room, where he had retired for the night, and made a hasty observation. The second engineer places the speed of the boat at three or three and a half or four miles an hour. The mate of the Locke says her speed was probably five miles an hour. The master of the Cyclone thinks it was three or four miles, and the master and lookout of the Oregon say it was four miles an hour. The master, mate, and lookout of the Mott testify, from their observations of the steamer as she passed, that she was going from seven to nine miles an hour. Thus the estimates of speed per hour vary from three to nine miles. The schooners in tow were sailing light. At the time of the collision the steamer was under sail as well as steam-power, carrying fore and main sail. The Locke was carrying foresail, main-sail, stay-sail, and two jibs. Whether the Cyclone was under sail does not appear. The wind was free for the steamer and her tow. The master of the Oregon says her sails were not drawing, but why were they up, if not to add to the propulsion of the boat? These are facts which tend to show that the speed of the Oregon and her tow was greater than is stated by the respondent's witnesses. If, instead of driving through a fog as dense as then prevailed, the steamer had stopped, even for a few moments, the noise of the machinery having ceased, the fog-horn of the Mott would probably have been heard. The master knew he was in a locality where there was liability to meet passing vessels.

The violence of the blows received by the Mott furnishes further evidence of the speed of the steamer and her tow. The Cylone carried away her jib-boom, and, as I infer from the evidence, quickly passed on out of sight in the fog. The blow of the Locke, according to the testimony, carried away bowsprit, knight-heads, rails, stanchions, bulwarks, plank-sheer, four streaks of plank below the plank-sheer, the anchor stock, fore and main rigging, chain-plates and lanyards, and fore, main, and mizzen topmast rigging, raking the vessel fore and aft.

Added to all this is the fact that the collision with the two vessels in tow occurred in rapid succession. The mate of the Locke says he heard a noise up ahead, which was when the Cyclone struck the Mott, and then, to use his own language, "in a second or two the Mott was right under our lee bow." He says, further, that the collision between the Mott and the Locke was within a minute, or a minute and a half, after he heard the noise on the Cyclone. The length of the tow line between the Oregon and the Cyclone was 300 feet. The proofs do not show the length of the line between the Cyclone and the Locke; but the blows of the two vessels in tow were evidently in very quick succession, and it is fair to assume that the length of the line

between the Cyclone and Locke was equal to that between the Cyclone and the Oregon. Thus, the facts and circumstances attending the collision point to the conclusion that such caution was not used in the matter of speed as the situation required. In so dense a fog, especially as the steamer had vessels in tow stretching out 500 or 600 feet behind her, I think it would hardly be unreasonable to say that it was her duty to stop long enough to listen for sounds from vessels that might possibly be approaching. At any rate, she could only properly run at such speed as would enable her to stop as soon as the close proximity of a vessel was known.

In the case of *The Pennsylvania*, 19 Wall. 125, the supreme court said that what is moderate speed "may not be precisely definable. It must depend upon the circumstances of each case. That may be moderate and reasonable in some circumstances which would be quite immoderate in others. But the purpose of the requirement being to guard against danger of collisions, very plainly the speed should be reduced as the risk of vessels is increased. In the case of *The Europa*, Jenkins, Rule of the Road at Sea, 52, it was said by the privy council: 'This may be safely laid down as a rule on all occasions, fog or clear, light or dark, that no steamer has a right to navigate at such a rate that it is impossible for her to prevent damage, taking all precautions at the moment she sees danger to be possible; and if she cannot do that without going less than five knots an hour, then she is bound to go at less than five knots an hour. * * *'" "And," says the court further, "even if it were true that such a rate [speaking of seven miles an hour] was necessary for safe steerage, it would not justify driving the steamer through so dense a fog, along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to."

In the case of *The Western Metropolis*, 7 Blatchf. 214, WOODRUFF, J., held that if the night was either so dark or so foggy that, by slowing, stopping, and backing as soon as the schooner was observed, the collision could not be avoided, then the steamer was moving at too great speed.

The case of *The Eleanora*, 17 Blatchf. 88, is directly in point upon this question. There, as appears by the opinion of Judge BLATCHFORD, then judge of the district court, (pages 91, 92,) the steamer, when the fog, which was very dense, came on, reduced her speed to five and a half miles an hour. The master, first mate, two seamen, and a lookout were listening attentively for sounds of fog-horns, and looking attentively for lights. Neither the steamer nor the vessel collided with became conscious of the presence of the other until just before the collision. Judge BLATCHFORD said:

"If the steamer had been going at less speed, or had gone ahead a short distance, and then stopped still and listened, and thus made her speed, or her passage from point to point through the intervening space, and not merely her running rate while in forward motion, that 'moderate speed' which the

statute requires, it is quite apparent that, blowing her whistle continually, at proper intervals, the blast would have been heard by the schooner, and answered by the fog-horn over the starboard side of the schooner, in sufficient season for the steamer to have stopped and backed, and be brought to a stand-still, before reaching the schooner. Therefore the steamer was in fault as to her speed."

This view was approved on appeal by Mr. Chief Justice WAITE, who said:

"A simple slackening of speed by a steamer in a fog is not always enough. She must run at a moderate speed, and is never justified in coming in collision with another vessel, if it be possible to avoid it. This implies such a speed only as is consistent with the utmost caution. Having complete control of herself, and being capable of so much damage if a collision does take place, the law has imposed on her the obligation of so directing her own movements, in the midst of the uncertainties of a fog at sea, as to be at all times under easy command. If she fails in this, she must suffer the consequences. Her rate of speed must be graduated according to the circumstances. The more dense the fog, the greater the necessity for moderation. The object is to keep her, if possible, under such control that she can be stopped after another vessel, with which she is in danger of collision, may be seen, or otherwise discovered."

This case in many of its material facts is remarkably similar to that at bar with respect to both the speed of the steamer and the duty of the schooner to display a torch light, and may well be considered authoritative upon the questions decided.

2. Was the Mott in fault? The testimony shows, in the first place, that she was sufficiently manned, and that the measures which were taken by the master for her safe navigation were such as good seamanship prompted. When he came on deck at 11: 30, which was at least 45 minutes before the collision, he took a position on the roof of the cabin, and, after the necessary observations, and before the Oregon's whistle was heard, he directed the watch below to be called to shorten sail. The mizzen-sail was reefed, and the light sails were clewed up. All hands were on deck, and were engaged in this work, except the mate, wheelsman and lookout, who were at their respective posts of duty. The master says he ordered this to be done so that fog-whistles might be more plainly heard and sounds located. He further testifies that he took the bearings of every whistle of the Oregon, and that when he heard the first whistle it bore south of the Mott. The next appeared to bear a little west of south, and another S. W. by W. from the Mott, two or two and one-half points abaft of her beam. In this he is corroborated by others of the crew, who heard the whistle, and noticed its bearings, but probably not with the care of the master. He says he concluded the steamer was going west, and astern of his vessel, and that therefore it was safe for the Mott to keep her course. Although the courses and distances of sound in such circumstances are apt to be misleading, from the best evidence the master had of the location of the steamer, and with the

care he exercised, I think he was justified in continuing on his course. Erroneously locating a vessel by the sound of her whistle in a fog is not necessarily a fault. *The Lepanto*, 21 Fed. Rep. 656.

Lights could not be seen. The master had to be guided by sound. His vessel was on the starboard tack, and the circumstances might well lead him to the conclusion that a change of course would increase the hazard. The Mott was going at a moderate rate of speed, and as soon as the master knew of the immediate proximity of the steamer, and perceived that a collision was imminent, he put the wheel of his vessel down, and luffed her up into the wind. Upon the liability to mistake, and the possible causes of mistake, in locating a vessel by the sound of her fog signals, see the very interesting opinion of Judge BROWN, of the Southern district of New York, in the case of *The Lepanto, supra.*

Upon a careful examination of the evidence, I am convinced that there was no neglect on the part of the lookout of the Mott in the use of the fog-horn. Before the master came on deck, and from the time the fog came on, the horn was sufficiently sounded. The lookout stood forward on the starboard side. It is true that the mate and lookout, before the watch below were called, took in the jib topsail and fore gaff topsail, but this was at about 11:30 o'clock, and before the whistle of the Oregon was heard; and, according to the testimony, the lookout was thus engaged only two or three minutes, and the work did not call him but a few feet away from the place on deck which he occupied as lookout. When the whistle of the Oregon was first heard the master says he directed the lookout to blow. long and distinct blasts, and that this was done. The second mate and the lookout went out on the jib-boom, and furled the jib topsail while others of the crew were doing other work on deck, but during this time the mate had the horn, and continued the blasts at short and regular intervals. This was about 12 o'clock, and a careful review of the evidence satisfies me that there was no want of diligence in the use of the horn from the time the fog came on, soon after 10 o'clock, down to the time of the collision.

The Mott did not show a torch light, and, under the decisions, this, I think, was a fault which throws upon her a share of the responsibility for the collision. Section 4234 of the Revised Statutes provides that every sail-vessel "shall, on the approach of any steam-vessel during the night-time, show a lighted torch upon that point or quarter to which such steam-vessel shall be approaching." It is only where it clearly appears that the exhibition of a torch-light could not have served any useful purpose, or given any additional information as to the position or course of a sailing vessel, that the omission to comply with this section can be held to be immaterial. *The Margaret*, 3 Fed. Rep. 870; *The Leopard*, 2 Low. 241; *Kennedy* v. *The Sarmatian*, 2 Fed. Rep. 911. If it is doubtful whether the exhibition of a torch-light would or would not have conveyed information to the

steamer for avoiding a collision, then the doubt must be resolved against the vessel which failed to comply with the statutory requirement. I cannot find as a fact in this case that a torch shown by the Mott would not have been seen by those on board the Oregon; and for this reason, if for no other, I must find the Mott guilty of contributory fault. *The Crawford*, 6 Fed. Rep. 911; *The Excelsior*, 12 Fed. Rep. 203.

The witnesses differ as to the distance a light could be seen on the occasion in question. The second mate of the Mott says the lights of the steamer could not be seen plainly 200 feet away. The lookout says a torch-light could not have been seen through the fog more than the distance of a vessel's length. The master places the distance at 100 feet. The master of the Oregon thinks it might have loomed up 500 feet off. The master of the Mott knew, from the repeated whistles, that there was a steamer in the neighborhood. He could not locate her, but he had occasion to know that it was possible she might be near by, although the sound of her signals indicated that she was going off to westward. It was an occasion for the greatest precaution.

In the case of *The Eleanora, supra,* the schooner had her colored lights set and burning, but Judge BLATCHFORD found as a fact that they were not seen at any time from the steamer, nor could they, or the lights of the steamer, have been seen, in such a fog as prevailed, at any useful distance. The master of the schooner came on deck very shortly before the collision. The persons on deck were listening and looking. They had a fog-horn, and it was being blown at proper intervals. In the opinion of the court, Mr. Chief Justice WAITE said that the schooner "was sailing in what she knew, or ought to have known, was a common thoroughfare of approaching steam-vessels at the time. Their fog signals were heard from various directions, and she was heading on a course crossing their regular tracks. The statutory rule is imperative. * * * No sailing vessel has a right to disregard this regulation because she thinks it unimportant. If she knows of the approach of a steam-vessel, she must exhibit the light, or take the risks of loss occasioned by its absence. * * * If exhibited, possibly the torch might not have been seen far enough away to have done any good, but such a possibility furnishes no excuse to the vessel for its absence. Nothing short of an absolute certainty that it could do no good, to be established by proof on the trial, will justify an omission to obey the rule. In a fog, all vessels must do all that is required of them by law or usage. While more is demanded of a steamer than a sailing vessel, it is as important that the sailing vessel should obey all the rules prescribed for her as that the steamer should not neglect those which are to govern her. Actual safety is dependent upon a strict performance by each of all their respective duties. * * * It was not proper to assume that the torch-light would have done no good. It was her duty to exhibit such a

signal, and, under the circumstances of the case, I cannot but consider it a fault that she omitted to do so."

Applying to the case in hand the rule thus laid down, the conclusion must be that the Mott cannot be exonerated from fault in the respect named.

As the Oregon and the Mott are both found to have been in fault, let there be a decree dividing the damages.