## THE MANHATTAN. THE NORTH AMERICA. THE ALBANY.

(District Court, S. D. New York. July 21, 1910.)

1. COLLISION (§§ 63, 64*)—STEAMER AND MEETING TOW—MUTUAL FAULT—INSUFFICIENT LOOKOUT—UNLAWFUL TOW.

   A tug with three barges in tow tandem, the first two on hawsers of 145 fathoms each and the third on one of 75 fathoms, was proceeding westward in Long Island Sound at night, when the steamer Manhattan, going eastward on a slightly converging course, came into collision with the second barge and sunk her. The Manhattan passed the tug starboard to starboard at a distance of 500 feet, but the tow was drifted more or less to the northward by a southerly wind. The barge was carrying proper lights, but they were not seen by the Manhattan, which ran into her at full speed. *Held*, that the Manhattan was clearly in fault for failure to keep an efficient lookout; that the tug and first two tows were also in fault for violation of the regulations made under Act May 28, 1908, c. 212, § 14, 35 Stat. 428 (U. S. Comp. St. Supp. 1909, p. 1100), which prohibit the use by tows of seagoing barges navigating inland waters of hawsers of greater length than 75 fathoms between each two vessels, and is equally obligatory on tows and towing vessels, and that the damages should be apportioned equally between the four vessels.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 79, 81, 82; Dec. Dig. §§ 63, 64.*]

2. COLLISION (§ 146*)—SUIT FOR DAMAGES—PARTIES—APPORTIONMENT OF DAMAGES.

   A libelant in a suit for collision, although suing only as owner of the injured vessel, nevertheless is a party personally, and subjects himself and all his property to the hazard of the litigation, and, if he was also the owner of one or more other vessels concerned in the collision and found chargeable with contributory fault, such vessels must be taken into account, although they have not been formally brought into the suit, and his recovery correspondingly reduced.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 298; Dec. Dig. § 146.*]

3. COLLISION (§ 146*)—APPORTIONMENT OF DAMAGES—DIFFERENT VESSELS OF SAME OWNER.

   The barges Hawthorn, Albany, and Troy, the property of the same owner, were in tow of a tug in Long Island Sound at night when a collision occurred between the Albany and the steamship Manhattan, which caused a second collision between the Albany and Troy. The owner, as owner of the Albany and Troy, brought suit against the Manhattan and the tug to recover for the injury to such vessels. The owner of the Manhattan also brought suit against the tug and the Albany to recover damages for the same collision. The two suits were tried together and the court found that the Manhattan, the tug, the Hawthorn, and the Albany were all in fault. The Hawthorn had not been formally brought into either suit.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*Held* that, under the rule of apportioning the damages equally among the offending res, the original libelant was entitled to recover one-half his damages, one-fourth from the tug and one-fourth from the Manhattan, and the owner of the Manhattan was entitled to recover three-fourths of his damages, one-fourth from the tug and one-half from the original libelant, the two suits being treated as one and a single decree entered.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 298; Dec. Dig. § 146.*]

In Admiralty. Suit by the Hillside Coal & Iron Company, as owner of the barge Albany, against the steamship Manhattan and tug North America, and cross-libel by the Maine Steamship Company, claimant of the Manhattan, against the barge Albany and tug North America. Decree for libelant for part damages.

Mr. Green, for Hillside Coal & Iron Co. and The Albany.

Mr. Symmers, for The North America.

Mr. Burlingham, for The Manhattan.

HOUGH, District Judge. Shortly after 11 p. m. of April 13, 1909, a collision occurred south of New Haven and about the middle of the Sound, between the Manhattan and the Albany, the second of three barges in the tandem tow of the North America.

The Manhattan is a propeller 235 feet long, and was bound from New York to Maine ports. The North America is a sea-going tug and was towing from Boston to New York three light sail-carrying sea-going coal barges. The hawser from tug to leading barge (the Hawthorn) was of approximately 145 fathoms, that from Hawthorn to Albany was of the same length, and the after barge (the Troy) was connected with the Albany by a hawser of 75 fathoms. The Albany and Troy are each 176 feet long, have two masts, and were at and before the time of collision carrying sail thereon. The Hawthorn is 184 feet long, with three masts, and had sail up on two of them at the time in question. The night, though dark, with rain at intervals, was "good for seeing lights." The wind was blowing strongly (estimated at over 30 miles an hour) from the southward, with a choppy sea. The tow had stopped at Vineyard Haven, and had there been made up to go through the Sound. The master of the tug had given general orders that plenty of hawser should be paid out, as there was quite a "heavy roll" coming across from Martha's Vineyard to the Race. These general orders had been interpreted by the barge masters as justifying hawsers of the lengths above stated. Each barge towed on her own hawser, and each barge master paid out what he wanted. After the tow got fairly into Long Island Sound, the weather got worse, in that it became rainy and the wind increased, but the sea was not so heavy; and, indeed, I think it clear from the evidence that in the Sound the sea was not heavy at all. No change was made in the hawsers of the tow from the time it left Vineyard Haven until after collision. The lines of a tow such as this cannot be shortened while under way. In order to change, it is necessary to stop and heave in hawser on the barges with the steam winches provided for that purpose on each barge. The Troy's tow-line was shorter than the others because she was the last boat in tow,

and with nothing behind her there was less strain on her line. It is not said that weather had anything to do with the length of the Troy's line.

Tug and barge masters in this case are evidently men of intelligence and experience. The barge captains are old sailors acquainted with vessels of differing kinds, and their testimony was not only intelligent, but frank and manly. They all unite with their tugmaster in declaring that on such a night as that of April 13th it was not safe to navigate with shorter towlines than were used. There is to be sure no evidence as to the size or strength of the towing hawsers, their material, or the possibility of using more than one; nor are reasons, scientific or empirical, given for the danger said to attach to lines of less than the great lengths above stated. Yet it must be, and is, found that in the judgment of experienced men of unimpugned veracity the only safe course in respect of towing lines was pursued by the North America on the night in question. The evidence does however show the kind of danger against which the long hawser is a safeguard, viz, injury to the vessel in tow or loss of hawser by parting, if a heavy craft jerks or surges through a seaway or against a wind. The result feared, plus some common knowledge, fairly shows that the sudden changes of tension thus arising constitute the danger apprehended by towed and tower; for, unless the strain be taken up by a long hawser, they evidently believe that either the hawser itself will go, or the vessel in tow be strained. It is demonstrable that this is true, but it is equally true that, the heavier the tow, the more rapidly will its safety require long hawsers; so that with large and heavily laden vessels the navigators may easily consider lines of much over 100 fathoms necessary whenever they are not favored with smooth water and almost perfect calm.† When off New Haven the North America was steering by compass west by south half south. This gave her a beam wind, which admittedly had the effect of making her tow tail somewhat to leeward. The extent of this leeward or northerly drift is in my judgment considerably minimized by the tug's testimony. The captain of the Hawthorn states that in his endeavor to keep after his tug he had to steer (or try to) west southwest, and it is in evidence from some observers on the tug that as they looked back during the evening they could sometimes see both the red and green lights of their tow and sometimes only the green. From this

---

† NOTE.—This opinion has been written at Vineyard Haven, where in warm calm weather I have for more than two weeks observed the numerous tows passing and stopping. Few light tows and no loaded ones have been seen with hawsers of less than 100 fathoms (except on the after boat). It is impossible to avoid the conclusion that even in weather when a skiff can safely cross Vineyard Sound those in charge of tows such as the North America's think that their own safety usually requires such hawsers as the North America was using on the night of collision. This is entirely consonant with the view of the law stated on the witness stand by the tug master in this case. He said he was bound to use hawsers of 75 fathoms, except when he thought safety required a greater length. It has been interesting to observe the effect of this legal opinion at the time of year when navigation is easiest, safest, and most pleasant.

testimony and from the nature of things, it is inferred that the tail of the tow was much more to leeward than the 75 feet or so allowed by the North America's captain; but how much more cannot be stated with exactness. The Manhattan, when approaching the point of collision, was on a compass course of east half north. There is no method of comparing the compasses of the two vessels, and both are assumed as correct. Neither tug nor steamer had a lookout stationed forward from and before the time when each saw the other. Inasmuch, however, as each had the other fully in view for 20 minutes before passing, it is found that the only effect that lack of lookout had upon the matter was to render it more difficult for the Manhattan to see the lights on the tow than it probably would have been had her master not humanely called his lookout into the pilot house, instead of leaving him on the forward deck where he was getting wet with spray, though no waves were coming over the steamer's bow.

By an agreement of testimony between steamer and tug, these two vessels passed each other starboard to starboard about 500 feet apart. Their aggregate speed was approximately 17 miles per hour, and within so short a time after passing the North America that way could not be taken off the Manhattan that vessel crashed into the starboard bow of the Albany about 1,900 feet astern of the North America. Computation of the courses above given, with even a small allowance for leeward drift on the part of the tow, shows that a collision was sure to happen as and when it did, if the Manhattan persisted on an east by north course after passing the North America 500 feet to the northward.

The sole excuse for this accident is the assertion that the Albany did not have her green light visibly burning within the time that it should have been seen by the Manhattan. It is suggested either (1) that the light went out; or (2) that it was obscured by the sails of the Hawthorn. The second suggestion is impossible. The Albany's lanterns were in her forward shrouds. All her own sails were abaft her lights, and with the steamer on a compass course crossing that of the tug, and the wind blowing the tow further to the northward, I am unable to imagine how any observer on the Manhattan could have had his view of the Albany interfered with by the sails of any vessel. The claim that the Albany's starboard light went out at the critical moment is supported by the very positive testimony of men who say that they looked for a light; that they could have seen it if it had been burning, and they saw no light on the starboard side of the Albany either before or after collision. The value of this evidence is I think greatly impaired by the singular ignorance of Capt. Johnson of the Manhattan as to the meaning of the three towing lights which he saw on the North America. I am satisfied that he did not expect to find more than one barge in tow and he saw the Hawthorn's lights plainly. His pilot, Harding, is not much better in his knowledge of the lights required by statute on towboats, and I am in doubt whether he at the time really attached the proper significance to the three towing lights he also saw. The Manhat-

tan's lookout (who was in the pilot house) seems a bright boy, but he frankly admits that the towing lights meant nothing to him. The first mate, Steele, I thought an intelligent and straightforward witness, but his testimony in common with the evidence of all his shipmates if believed proves too much, for they all not only saw no green light on the Albany, but they never saw but one light, and that a red one, on either the Albany or the Troy. In the face, therefore, of ample testimony from the tug and tow that down to a very few minutes of collision all the lights on all the barges were set and brightly burning, I feel compelled to find that the Albany's lights were burning at and before collision and should have been seen by competent and attentive observers. It follows that the Manhattan is at fault, and responsible for collision with the Albany, as well as for damage to the Troy, caused by that barge overrunning the Albany as the latter stopped to sink.

It is, however, alleged that both tug and tow are at fault for towing with hawsers unlawful under section 14, Act May 28, 1908, c. 212, 35 Stat. 428 (U. S. Comp. St. Supp. 1909, p. 1100), and the regulations duly promulgated in compliance therewith dated December 7, 1908. The act of Congress declares that such regulations "shall have the force of law." It is therefore law that "tows of sea-going barges navigating the inland waters of the United States are limited in length to four vessels including the towing vessel or vessels," and "hawsers are limited in length to 75 fathoms measured from the stern of one vessel to the bow of the following vessel, and should in all cases be as much shorter as the weather or sea will permit." The language quoted constitutes (in effect) a general statutory requirement binding upon all persons engaged in navigating inland waters by or in tows, and is just as obligatory upon the towed as the tower. At Vineyard Haven and continuously thereafter the North America was in inland waters, and, unless therefore some exception is to be found in the statutory regulations, the hawsers of the Hawthorn and Albany were at all times unlawful. That of the Troy was not.

The only exception applicable to the waters traversed by this tow is as follows:

"(4) In case of necessity on account of wind or weather, hawsers of vessels navigating between Race Rock and Gay Head may be lengthened out in the discretion of the master of the towing vessel; but this paragraph shall not apply to Narragansett Bay north of Beavertail Light."

Language cannot more clearly limit the master's discretion. The moment a vessel with hawsers longer than 75 fathoms, bound as was the North America, passed Race Rock, her hawsers became unlawful. It is urged for the tow that to expect the barge master to hail the tug captain when arriving at the geographical limits of the latter's discretion and insist on a shorter hawser is absurd, and that whatever liability attaches to a transgression such as shown here must be that of the tug. In this there is force—up to a certain point. Doubtless a tug captain who violates the law against the will or pro-

test or both of the barge master will assume certainly for himself and probably for his ship and owner a liability that would otherwise be that of the barge. But the matter is wholly speculative and irrelevant in this case. The act of Congress referred to has laid a new and positive duty on vessels, whether towing or towed. All men who are free agents must obey or take the consequences, and in this case all the vessel masters united voluntarily, and in a mistaken view of what the law meant, to do an unlawful thing; i. e., tow through Long Island Sound with hawsers of over 75 fathoms. In that Sound, and all other unexcepted waters, it makes no difference what the sea or weather or both may be. It is immaterial what the danger to the tow may be. Hawsers must not be longer than 75 fathoms. If towing cannot be done on such hawsers with safety, it cannot be lawfully done at all. It is quite possible that a tow coming from the open sea or from some excepted inland waters into a region plainly within the statutory regulations might find obedience impossible and be compelled to go ahead, unable to stop or make a harbor. But he who sets up vis major must prove it; and it is obvious in this case that all on the North America and her barges continued with their long hawsers after reaching the Sound not because they had to, but because they preferred to.

The consequences of an unexcused violation of statutory regulations is a presumption of fault against the violator. In this case, not only is the presumption unrebutted, but it affirmatively appears that, had the hawsers of the Hawthorn and Albany been of statutory length, there could have been no collision.

It follows that the damages resulting from this collision were caused by the negligence of the Manhattan, the North America, the Hawthorn, and the Albany, and the losses will be distributed in accordance with the ruling in the E. F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600.

## On Settlement of Final Decrees.

Some consideration of the effect of the decision in the Eugene F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600, upon these cases, seems proper. The suit in which the Hillside Coal & Iron Company is libelant is in legal framework identical with that of the Henry Dubois Sons Company, tried, appealed, and heard with The Moran. Both the Dubois Company and the Hillside Company owned two vessels which were in tow of a tug, and each one of said two vessels was at fault for violating a statutory regulation. Both companies, however, filed their libels only "as the owner" of the single faulty vessel injured, and did not in their libels mention ownership of the other craft.[1] This explains the language of Holmes, J., on

---

[1] The fact that the Hillside Company owned three vessels in tow of the North America (two of which were injured) does not render the above statement untrue. The Troy was not at fault, and while her presence increased damage because she was injured, it did not affect the number or identity of the vessels or persons responsible for that damage.

page 476, of 212 U. S., page 341 of 29 Sup. Ct., 53 L. Ed. 600, where he says:

"The fact that (scow) 18D is not a party to the (Dubois Company) suit does not matter so far as the question of partially exonerating those before the court is concerned."

The quoted words assume that the Dubois Company by filing its libel only as the owner of the 15D did not make the 18D a party to the suit, nor in form bring it into the litigation. The difficulty thus disposed of by Holmes, J., did not pass unnoticed when the Moran was tried in this court. It was then contended, inasmuch as the 18D had not been brought into the suit by proceedings under the fifty-ninth rule or otherwise, that, even if damages were to be apportioned strictly according to the number of res involved, the Dubois Company's recovery must be separated into thirds of which the libelant as the owner of the 15D (the only libelant's vessel injured) would bear one part and each of the two vessels libeled another part. The Lyndhurst (D. C.) 92 Fed. 681. Against this it was urged that a libelant voluntarily places himself before the court. He must sue as a person, for the personification of a vessel cannot extend so far as to make that vessel a libelant or appellant. Cf. The Steamboat Burns, 9 Wall. 237, 19 L. Ed. 620. Any person suing subjects himself and all his property to the exigency of the suit according to familiar principles. Therefore the Dubois Company in the action in which it was libelant had in a very real sense brought not only the 15D and the 18D, but all its property, into the litigation. It followed that as libelant sought to recover damages for injuries caused by four vessels, two of which were its own property, all the damages recoverable in that suit should be divided, so that one-fourth should fall upon each vessel, irrespective of ownership. This last view prevailed, though the course of reasoning is not set forth in the opinion of Holt, J., 143 Fed., at page 188. The decree entered pursuant to the opinion last cited having been affirmed in all courts, a similar decree must be entered in favor of the Hillside Coal & Iron Company, with the result that the damages computable in that case should be divided equally between the Hawthorn, Albany, Manhattan, and North America. This is equivalent to giving libelant a decree for half damages.

The suit in which the Maine Steamship Company as owner of the Manhattan is libelant is not exactly like either of the litigations before the Supreme Court in The Moran, supra. It differs from that case, in that only one of the offending vessels belonging to the Hillside Company has been proceeded against, and it therefore presents acutely the question whether it be necessary to libel in rem all the offending vessels of a single owner in order to arrive at that division of damages equally among the offending res of which the Supreme Court has now definitely approved. It would seem upon principles of admiralty procedure thought to be well settled that upon the seizure of a vessel in rem the owner or agent who appears and lays claim thereto is admitted to defend only pro interesse suo. He gives a bond or stipulation never greater than the value of that which he claims, and has at the hazard of the litigation, not all his property, but only that which was seized and claimed in due form. It must

therefore be admitted that although the Maine Steamship Company might have sued not only the North America and the Albany, but also the Hawthorn, by omitting the Hawthorn the number of res brought into the action has been limited to three. How, therefore, can the result laid down as lawful by the Supreme Court be reached when all the offending vessels are not brought in, but when the owners of them all are either as libelants or claimants before the court? This was done in the Dubois Company's Case by the language of Holmes, J., first above quoted, viz.: That the absence of one vessel did not matter "so far as the question of partially exonerating those before the court is concerned." There is certainly greater difficulty in taking into account the omitted vessel of a claimant than in considering the similarly omitted vessel of a libelant, for the libelant sues generally for his personal claim, while the claimant in strictness of law does no more than defend a thing in which he happens to have an interest, and cannot be heard beyond the interest which he has therein. But if, as we have now been informed, the crucial inquiry in distributing collision (and probably all admiralty) damages is not, against whom shall liability be decreed, but who is entitled to exoneration and to what extent, it can make no difference whether it be a libelant or a claimant who brings one vessel into an action when the proof shows him to be also the owner of other vessels which might have been brought in either by original process or under the fifty-ninth rule. The result in the case of the Maine Steamship Company's libel is that the Albany and North America are each entitled to be exonerated from three-fourths of the damage, and this is equally true of the Hawthorn and the Manhattan. Since exoneration of one-fourth is equivalent to recovery of three-fourths of any damage suffered, the Maine Steamship Company is entitled to recover the latter fraction of its damages, yet it can only do so by charging (in form) one-half thereof against the Albany. No other practice, however, is possible without either (1) disregarding the exoneration of the North America; or (2) causing the libelant to lose so much of its damage as would have fallen on the Hawthorn had that vessel been joined in the suit. It is difficult to see why this does not in effect make the Hawthorn a party to the Maine Steamship Company's suit, but Holmes, J., assumed that the 18D was not a party to The Dubois Company's action, and yet enforced a decree just as if it were, because her owner was before the court. The same result must follow here, for, if it be not reached, the exoneration to which the parties technically before the court are entitled cannot be enforced.

In these cases the formal difficulties above alluded to (and very repugnant to any careful practitioner) may be overcome by entering a single decree as in The Eleanora, 17 Blatchf. 88, 8 Fed. Cas. No. 4,335, at page 427. Here, as there, the causes arose out of a single collision, and were tried together upon the same testimony. If they be considered in effect as one case, then all the parties in interest are plainly before the court, and the Hillside Company is promoting the suit. Let one decree be entered and one reference ordered and the aggregate damage discovered. Of that damage the

Hillside Coal & Iron Company will bear one-half, the claimant of the Manhattan one-fourth, and the claimant of the North America the remaining one-fourth. Costs will be divided in like manner.

Note.—Since failure to recover is just as much a loss as is payment in cash to an opponent, the following tabulation will show the manner in which the damage falls:

Let X equal damage to Troy and Albany, and Y equal damage to Manhattan; then—

|  | Pays Loses |  |
|---|---|---|
| Hillside Co. | $\frac{1}{2} Y + \frac{1}{2} X$ | $= \dfrac{X+Y}{2}$ |
| North America | $\frac{1}{4} X$ | $= \dfrac{X+Y}{4}$ |
| "     " | $\frac{1}{4} Y$ |  |
| Manhattan | $\frac{1}{4} X + \frac{1}{4} Y$ | $= \dfrac{X+Y}{4}$ |

$$\frac{1}{2} X + \frac{3}{4} Y + \frac{1}{2} X + \frac{1}{4} Y = X+Y$$

If this rule of exoneration be finally recognized, the result in cases where damage is done by the fault of a plurality of vessels owned by one person will be, to say the least, singular. It may well happen that, by the fault of all the vessels in a large tow, another craft (also in fault) is injured. Should the tow be owned by one man, a libel against one barge might result in the recovery of (say) $^{19}/_{20}$ of libelant's loss. This is grossly unjust, and the rule of proportionate allotment of damage must ultimately prevail. In this case the decree directed seems to me a fair "rusticum judicium."